[No. 11708.   Department Two. — May 21, 1889.]

## SALINAS CITY BANK, APPELLANT, v. J. E. GRAVES, RESPONDENT.

PLEDGE— POSSESSION BY PLEDGOR — ATTACHMENT. — When pledged property is allowed to go into the possession of the pledgor, it is subject to attachment by his creditors.

ID. — COLLATERAL SECURITY — WAREHOUSE RECEIPT — LOSS OF LIEN. — When a mill company agrees with a bank to cash its drafts for grain purchased, and transfers warehouse receipts for the grain to the bank as collateral security for the repayment of its advances, the bank has a lien dependent on possession, and while the grain remains in the warehouses of third parties and the bank holds the receipts, it has sufficient possession to keep its lien valid; but when the receipts are indorsed and delivered, together with the grain, to the mill company, in order that it may crush the grain, the lien of the bank as against creditors of the mill company is extinguished.

ID. — ASSIGNMENT OF NON-NEGOTIABLE DEBT — NOTICE — ATTACHMENT OF PLEDGED PROPERTY — ESTOPPEL. — After notice of the assignment of a debt given to the debtor and to his pledgee, the assignee cannot be estopped or compromised by any subsequent act of the assignor in consenting to the possession of the pledged property by the pledgor, so as to bar an attachment of the property in the hands of the debtor, by the assignee of the debt.   The fact that the indebtedness assigned was not evidenced by a negotiable instrument is immaterial to the rights of the assignee as against the pledgor under such attachment.

APPEAL from an order of the Superior Court of Monterey County denying a new trial.

The facts are stated in the opinion of the court.

*William Matthews,* and *Morehouse & Geil,* for Appellant.

*Jarboe, Harrison & Goodfellow,* and *W. S. Goodfellow,* for Respondent.

McFARLAND, J.—Plaintiff is a banking corporation. Defendant was sheriff of the county of Monterey.   There was also another corporation in said county known as the Salinas Flouring Mill Company, having a mill and appurtenances, and being engaged in buying grain and manufacturing it into flour, bran, and other products.

On September 6, 1884, one George Grant commenced an action against this last-named corporation (which we will call for convenience the mill company) to recover about seventy-five thousand dollars, and sued out a writ of attachment, which defendant, as sheriff, levied upon a large quantity of grain, flour, etc., as the property of said mill company.   On October 10, 1884, in pursuance of an order of court duly made, he sold said property for $17,640, which he holds subject to the further order of the court.   Plaintiff brings this action to recover said money, upon the claim that said grain, flour, etc., so sold was the property of plaintiff.   Defendant justifies under the writ of attachment, and upon the ground that the property attached and sold was the property of the mill company.   The case was tried without a jury, and the court rendered judgment for defendant.   Plaintiff appeals from an order denying a new trial.

It is clear, from the findings and evidence, that at the time of the attachment the property in controversy was in the actual possession of the mill company.   Part of it was in the mill of that company in which it was carrying on its business, and the balance was in a warehouse owned and occupied by said company, and connected with the mill by a railroad about one hundred feet long. Plaintiff contends, however, that the property belonged to it, and was only temporarily in the possession of the mill company for a special purpose.   But defendant contends that the only interest which plaintiff had in the property was that of a pledgee having a lien as security for the payment of money advanced for the mill company; and that as the pledged property was allowed to go into the possession of the pledgor, it was subject to attachment for the latter's debts.   If this last contention is true, then the judgment was correct, and the order denying the new trial should be affirmed.

The main facts found by the court upon sufficient evidence are as follows: On the 1st of June, 1883, the mill

company, being desirous of purchasing grain for its business, passed the following resolutions:—

"*Resolved,* That the president of this corporation be, and he is hereby, authorized and directed, on behalf of this corporation, to enter into an agreement with Mr. H. S. Ball, to engage the said H. S. Ball to purchase grain for this corporation; that such agreement be made on the best terms obtainable; *provided,* that the commission to be paid the said H. S. Ball does not exceed twenty-five cents per ton.

"*Resolved,* That the Salinas City Bank, at Salinas, California, be, and is hereby, requested to cash all drafts drawn upon this corporation by Mr. H. S. Ball, of Monterey County, for the price of grain purchased by him for the account of this corporation; and said H. S. Ball do transfer to said Salinas City Bank the grain so purchased upon his said drafts being cashed; and this corporation agrees to repay said Salinas City Bank the amount of said drafts, with interest, on demand; and that the grain so purchased shall be held by said Salinas City Bank *as collateral security* therefor; and said Salinas City Bank to keep said grain fully insured at the cost of this corporation."

The plaintiff had a certified copy of these resolutions, which were Ball's authority to draw on the bank. The court also found that "under these resolutions said Ball was employed by said mill company to purchase *for it,* from the farmers of Monterey County, wheat for the use of said mill company, and plaintiff agreed with the said company to advance the necessary funds to enable said company *to make said purchases of wheat.*" Ball proceeded to purchase grain from farmers for the mill company. Upon the delivery of wheat so purchased, at certain warehouses, Ball would give his check to the farmer on the bank (plaintiff) for the amount due, and would at the same time take a warehouse receipt in the name of the plaintiff, which the farmer would take to the bank,

together with the check.   This manner of doing business continued until December, 1883, when James Baumberger became secretary and general manager of the mill company.  After that, Ball drew his checks on the mill company, and Baumberger, as secretary, drew its checks on plaintiff in favor of the farmer for the price of the grain purchased, plaintiff still receiving and holding the warehouse receipts as collateral security for the advances made on account of the mill company.   There were also other advances made by the bank for the mill company.   After March, 1884, by agreement between the bank and the mill company, with intent to "increase plaintiff's security and value of said grain," grain was taken from time to time from the said warehouses by the mill company to its mill, and after having been ground into flour, etc., was (that not sold) placed in the said warehouse of said mill company near its mill.   To accomplish that purpose, whenever Baumberger, manager of the mill company, wanted grain from the warehouse, the plaintiff indorsed to him warehouse receipts for the amount required.   It was agreed between the bank and the mill company, that while the grain was in the mill and warehouse of the mill company "possession thereof should be retained by plaintiff until the purchase-money of said wheat, and any other advances made to said mill company, and interest on the same, should be fully paid to plaintiff," and that it "should remain the property of plaintiff *as before.*"

With this view, on March 22, 1884, the mill company made a lease of its warehouse to W. S. Johnson, as trustee of the bank, for the term of ninety days.   Thereupon Baumberger gave the keys of the warehouse to Johnson, who a short time afterward put one Peterson in charge and gave him the keys.   Until the latter part of June, 1884, Peterson opened the warehouse in the morning, and at night took an account of wheat that had been put in and taken out, and reported to Johnson.   During the

day, Baumberger, as manager of the mill, had control of the warehouse, and the employees of the mill company had access to it as usual. Peterson was the employee of Baumberger at a warehouse which the latter had about six hundred yards distant from the mill. In the latter part of June, 1884, Peterson quit Baumberger's employ, and Johnson "put said Baumberger in possession of said mill, warehouse, and the grain, flour, etc., therein, and gave him the keys thereof"; and things remained in that condition until September 8, 1884, when the attachment was levied. "All of said grain, flour, etc., attached by defendant was a portion of the grain and the produce thereof purchased by H. S. Ball for said mill company, and for which the plaintiff had received the warehouse receipts, as aforesaid, and subsequently delivered to Baumberger for the purpose aforesaid." From December, 1883, to the time of the levy of the attachment, Baumberger, "apparently as the employee of the mill company, had the full possession, control, and management of the business; employed men, discharged them, paid them off by checks of said mill company, signed by him as secretary on said bank, which were paid by the bank and charged to the mill company, as were all other advances." When the grain was converted into flour, the flour was put into sacks and branded "Salinas Flouring Mills," and was taken by the employees of the mill company to its warehouse. Such of it as could be sold to the local trade of Salinas City, and at points between that city and San Francisco, was so sold by Baumberger as manager of said mill company, and the proceeds were paid by him to plaintiff, and credited by plaintiff to the mill company. "When a surplus of flour accumulated in said mill warehouse said Baumberger was directed by plaintiff to 'ship the same for and on its account to said warehouses' [certain named warehouses] in San Francisco; and he shipped the same by rail and took 'shipping receipts therefor,' which read thus: 'Received of

the Salinas Flouring Mill Company,' etc., and wrote letters to said warehousemen in San Francisco, instructing them to issue receipts for said flour to the plaintiff and return the same to plaintiff, which was done; and said letters of instruction were signed, 'Salinas Flouring Mill Co., by Baumberger, Secretary.' Said flour was sold and the proceeds thereof was credited by said plaintiff to said mill company's account." All of the grain was taken from the original warehouses to the mill, ground into flour, and taken to the mill warehouse and out of it by the employees of the mill company, under the direction of its manager, Baumberger.

From these facts, it is apparent that during the whole transaction the relation of the bank (plaintiff) to the grain and flour was merely that of one who has a lien on personal property as security for the payment of a debt, — the validity of the lien being dependent on the possession of the property. The bank was not engaged in the purchase of grain, and did not purchase the grain in controversy. It was purchased by Ball for the mill company. When delivered at the warehouse it was the property of the mill company. By the direction of Ball, acting for the mill company, the receipts were issued in the name of the bank, because, by a previous arrangement, security to the bank was to be effected in that way.

In the resolutions passed, and in the testimony of appellant's witness, we find the words "security" and "collateral security" expressly used; so that there can be no doubt what the transaction was intended to be. While the grain remained in the original warehouses (of third parties) and the bank held the receipts, the latter, no doubt, had sufficient possession to keep its lien valid; but when the receipts were indorsed and delivered together with the grain to the mill company, the latter had both the title and the possession, and the lien of the bank as against creditors of the mill company was extinguished.

We think that appellant's point, that the attaching creditor, Grant, was estopped by the acts of his assignor, Charles R. Lloyd, from denying that the grain was the property of the bank, cannot be successfully maintained. On and prior to June 11, 1884, the mill company was indebted to said Lloyd in the sum of $84,579.49 for advances made by him for it, and he was indebted to the Nevada Bank, of which Grant was assistant cashier, in the sum of $84,000; and in consideration of said latter indebtedness, Lloyd, on said June 11, 1884, "sold, assigned, and transferred" his said indebtedness and account against the mill company to said Grant, for said Nevada Bank, and on June 18, 1884, he notified J. D. Carr, who was president of the Salinas City Bank (appellant), and also president of the said mill company, of said assignment. Lloyd was one of the board of directors of the mill company; and, as one of said directors, voted for the ninety days' lease of the warehouse (above noticed), which was made to Johnson, as trustee for plaintiff, on the twenty-second day of March, 1884. But Peterson, whom Johnson put in possession of the warehouse, retired (as above stated) in the latter part of June, 1884, and Baumberger, manager of the mill company, took possession; and with respect to this transaction the court finds as follows: "There was no resolution or action by the mill company corporation authorizing or directing Baumberger to hold the grain or flour or any produce of the Salinas City Bank in any manner whatever. It was done by the direction of J. D. Carr, who was then president of said mill company, and also of said bank, the plaintiff herein, with the tacit consent and knowledge of some of the directors of said mill company, of whom Charles R. Lloyd was one." This is hardly a finding that it was done with the consent, etc., of Lloyd. Upon its face it is a finding that the thing was done with the tacit consent, etc., of some of the directors, and that Lloyd was one of the directors; and this

latter construction is probably the correct one, because there is little, if any, evidence to show that Lloyd knew of or consented to the particular way in which appellant claims that Baumberger was running the business.

But assuming the finding to mean that it was done with the tacit consent of Lloyd, and assuming that such "tacit consent" would be sufficient to estop Lloyd, we do not see how it would have that effect upon Grant. Before the possession had gone from Petersen to Baumberger, Lloyd had sold and assigned his claim against the mill company to Grant, and had no further control of it, and the bank had been notified of such sale and assignment. After that the bank knew that Lloyd's indebtedness had passed to a third party, whose rights could not be compromised by anything that Lloyd might thereafter do. If, afterward, appellant allowed the pledged property to go into the possession of the pledgor, Grant could not be defeated as an attaching creditor by any tacit consent of Lloyd. The attachment was not levied until about three months afterward, and Lloyd had nothing to do with it, and had no knowledge of it, until after it was levied. And we do not see any materiality in the fact that the indebtedness was not a "negotiable instrument." That consideration could be of importance only as between the mill company and the attaching plaintiff.

We think there is no material conflict in the findings, and that they are supported by the evidence.

The order denying a new trial is affirmed.

THORNTON, J., and SHARPSTEIN, J., concurred.

Hearing in Bank denied.