## In re SHULMAN et al.

(District Court, E. D. Pennsylvania.   June 26, 1913.)

### No. 4,129.

**1. SALES (§ 220*)—ASSIGNMENT OF CONTRACT—EFFECT.**

A bankrupt, having sold goods and delivered them to a carrier for transportation to the buyer, went to a bank to procure a loan on the account and executed instruments describing the account, and providing that for value received the bankrupt had sold, assigned, and transferred to the bank the claims or accounts set forth in the attached schedule, "and the goods covered by or described therein," and all moneys due or to grow due on the same or sales set forth, etc., with the sole right to collect the same as collateral security for advances. *Held*, that since at the time the assignment was executed the bankrupt had parted with title to the goods, and for that reason could not pledge them, the contract evidenced only a pledge of the accounts or claims against the buyer for the price, so that on his refusal to accept the goods the quoted clause did not vest title thereto in the bank.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 606; Dec. Dig. § 220.*]

**2. BANKRUPTCY (§ 140*)—PROPERTY—OWNERSHIP.**

A bankrupt, having sold goods and delivered them to a carrier for transportation to the buyer, assigned the account therefor to a bank as security for advances, the instrument providing that, on the buyer's rejection and return of the goods or any part thereof, the bankrupt would receive the same in trust for the bank and surrender them or the proceeds thereof if sold on demand, etc. The goods, having been returned, were redelivered to the bankrupt, and before the bank obtained possession by replevin bankruptcy proceedings intervened, and the goods were delivered to the bankrupt's trustee. *Held*, that such provision of the contract did not effect a valid pledge of the goods for want of delivery to the bank.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. § 140.*]

In Bankruptcy.   Proceedings against Louis Shulman and others, trading as Louis Shulman & Bro.   On certificate to review a referee's order denying the application of the Bank of Commerce for the proceeds of the sale of certain raincoats alleged to have been pledged to the bank by the bankrupts as security for a loan.   Affirmed.

B. Franklin Pepper and George Wharton Pepper, both of Philadelphia, Pa., for claimant.

Wessel & Aarons, of Philadelphia, Pa., for trustee.

J. B. McPHERSON, Circuit Judge.   This certificate brings up for review the refusal of the referee (D. W. Amram, Esq.) to support the claim of the Bank of Commerce to be the assignee of certain raincoats —either the vendee or the pledgee.   The coats were the product of the bankrupts' factory; and, as they were in the firm's possession when

the involuntary petition was filed, the referee was right unless the bank's title was better than the prima facie title of the trustee. The facts now important are as follows:

As part of its business in the city of Philadelphia the bank lends money upon the security of commercial accounts, taking assignments thereof as pledgee. On or about June 28, 1911, a member of the firm applied for a loan upon security of this kind; one or two similar transactions having taken place between the parties. The bank's president asked about the firm's financial condition, and received a written statement showing that six months before, on December 31, 1910, their assets were more than $135,000 greater than their liabilities. Influenced by this statement, the bank agreed to make certain advances, and the firm executed a regular printed form of assignment, which will be quoted in a moment. The schedule that practically accompanied this form (although it was not actually delivered until the next day) embraced 13 accounts, 5 of them aggregating $14,524 for coats sold by the firm to Charles Josephson of New York, and upon these 5 the bank lent $10,-892. The firm also delivered to the bank the usual invoices describing the goods in detail, and a bill of lading or freight receipt showing shipment by rail to Josephson on June 28. Both the bank and the firm gave Josephson prompt notice of the assignment. At this time the bank had no knowledge, and no reasonable cause to believe, that the firm was insolvent. Josephson refused the goods, and they came back to the firm toward the end of July. They were then unpacked, and placed with the rest of the stock. The accounts would not have fallen due until October, and Josephson did not inform the bank that he had rejected the goods. Neither did the firm advise the bank of that fact until the last day of July. Thereupon the bank demanded immediate repayment of the loan, and when the firm could not repay, but offered the goods instead, the bank declined the offer, and continued during several days to demand either repayment, or some other satisfaction than delivery of the coats. But on August 7 the landlord distrained for rent upon these among other articles, and as the situation had evidently become critical the bank on August 8 for the first time demanded possession, claiming to be the assignee (either as vendee or pledgee) under the paper executed on June 28. On August 9 an involuntary petition in bankruptcy was filed, and on August 11 the bank replevied the coats, but, of course, could not interfere with the district court's possession, and was compelled to give them up. They were afterwards sold by a receiver, and this contest is over the proceeds of sale.

[1] Let us now examine the contract of June 28. Except one paragraph, which I omit for the present, the agreement is as follows:

"Know all men by these presents, that Louis Shulman & Bro. for value received have bargained, sold, assigned, transferred and set over, and by these presents do bargain, sell, assign, transfer and set over unto the Bank of Commerce, its successors and assigns, the claims or accounts set forth in the schedule hereto annexed, marked 'Schedule A' for identification, and made a part hereof, *and the goods covered by or described therein,* and all moneys due or to grow due upon the same, or sales therein set forth, and the sole

right to collect the same, as collateral security for the payment of the advances hereunder made to the undersigned by the Bank of Commerce and as collateral security for the payment of any past or any future obligations of or advances made to the undersigned, and all securities, property, accounts and claims together with any that may be pledged hereafter, shall stand as one general continuing collateral security for the whole of said obligations or advances, so that the deficiency on any one shall be made good from the collateral for the rest; and we hereby constitute and appoint said Bank of Commerce our true and lawful attorney, irrevocably for us and in our name and stead, but to its own use and benefit, to collect, receive, receipt for, sell, assign, transfer, set over, compromise or discharge the whole or any part of the aforesaid claims or accounts, and for that purpose to do all acts and things necessary or proper in the premises, and one or more persons to substitute with like power, hereby ratifying and confirming all that our said attorney or its substitute or substitutes shall lawfully do by virtue hereof.

"The undersigned hereby guarantees and certifies that the accounts so assigned are bona fide sales and correct accounts for goods actually sold and delivered and accepted, and that there is no set-off or counterclaim of any kind thereto; and agrees that any counterclaim or deductions allowed will be refunded by us by allowing the same to be deducted from future advances or by payment of the amount of such deductions in cash at the option of the Bank of Commerce, and that any invoices or bills rendered by us for these accounts shall have the statement upon their face, that they are payable only to the bank of deposit designated by the Bank of Commerce.

"The undersigned hereby guarantees payment in full at maturity of the accounts hereby assigned and of all other accounts which may be assigned in the future, and hereby authorizes the Bank of Commerce to charge to our account the amount of any accounts so assigned which may become overdue or in the opinion of the bank are undesirable. * * *

"The undersigned hereby covenants that all the said merchandise so sold, shipped and delivered was packed under our personal supervision and legibly marked with the address of the consignees and delivered to common carriers, against their receipts or bills of lading to be forwarded to their respective destinations.

"The amounts advanced by the Bank of Commerce shall bear interest at six per centum per annum, and the said bank shall be entitled to charge for its collection services ½ per centum per month on the face value of all accounts assigned to it to the date of collection or payment.

"And we do hereby represent to the said Bank of Commerce that the said respective amounts in 'Schedule A' are owing to us and are outstanding to our credit and our name to the amount set forth in the said annexed schedule and that they have not been transferred or assigned, or given in any way as collateral security or otherwise, to any other person, and that these representations and covenants are made for the express purpose of inducing the said Bank of Commerce to part with its money and make this loan.

"In case the undersigned shall hereafter assign to the Bank of Commerce accounts additional to those included in 'Schedule A' said additional accounts shall upon acceptance by the bank become subject to all the provisions of this agreement as if originally entered in the schedule.

"In witness whereof we have hereunto set our hand this June 28th day, 1911.                                            Louis Shulman & Bro.
                                            "By Louis Shulman."

Attached to this paper is a form of Schedule A, which is intended to receive the names and other descriptive details of such accounts as may be assigned; but, although the schedule also was duly signed, it remained blank, and no entries were ever made therein. But on the next day, June 29, the firm presented to the bank the following paper:

"Louis Shulman & Bro.

"Date June 29, 1911.     No. 39013

"To the Bank of Commerce, Philadelphia, Pa.

"Referring to our contract with you, dated June 28, 1911, we hereby tender for your acceptance additional accounts as per schedule enclosed. Upon your acceptance these accounts will become subject to all the provisions of said contract as if originally scheduled therein.

| Due Date | Name | Address (City and State) | Gross Amt. of Invoice | Advance |
|---|---|---|---|---|
| Oct. 24 | Chas. Josephson | New York | $1327.50 | 996. |
| Nov. 9 | do  do | do | 6359.50 | 4770. |
| " 9 | "  " | " | 1713.00 | 1283. |
| Dec. 9 | "  " | ". | 3200.00 | 2400. |
| " 9 | "  " | " | 1924.00 | 1443. |
| | &c.  &c.  &c. | | | |

"Dated June 28, 1911.

"We do hereby certify and declare that the above is a true and correct inventory of the accounts assigned by us this day to the Bank of Commerce, for goods shipped to the above named firms.

"Louis Shulman & Bro. ·
"By Louis Shulman."

[1] These two papers constitute the contract, and I think it is clear that the transaction (up to this point, at least) is the ordinary pledge of book accounts as collateral security for a loan. If it were not for the clause italicized—"and the goods covered by and described therein"—there is not a word that even suggests a different agreement. And this clause is suggestion merely, for I think it is equally clear that the clause could have no immediate effect upon the goods themselves. No doubt it professes to pledge them, but at the time the firm had no such power. The coats had previously been the undisputed and unincumbered property of the firm; they had been sold to Josephson, had been consigned to him at New York, had been delivered to the carrier, and at the time the contract of June 28 was executed the firm had neither title nor possession, and could not pledge them to the bank. An agreement might be made to pledge them in the future if certain contingencies should arise—that matter will be considered hereafter—but they could not be pledged in fact because they had already been sold to another person, and had passed out of the firm's possession and control. Therefore the clause just referred to had no effect at that time upon the title to the goods; at the best, it amounted merely to a promise by the firm that, if necessary, they would pledge the goods to the bank at some indefinite time in the future, and under some undefined circumstances. Therefore, upon the foregoing portion of the agreement, no title to the coats was conveyed to the bank. Accounts were transferred, but not the tangible property.

[2] But the omitted paragraph must now be considered. It contemplates that the goods may not be accepted, in whole or in part, and undertakes to provide for such a contingency.

"And the undersigned hereby covenants to and with the Bank of Commerce that in the event of rejection and return of all or any part of the merchan-

dise so sold, shipped and delivered, that we will receive the same in trust for the said Bank of Commerce under advice to them and surrender it, or the proceeds thereof if sold, upon demand; and that if we should fail to pay the Bank of Commerce any sum or sums which may be due hereunder, or should we convert or appropriate any property, checks or payments belonging to the Bank of Commerce, that then and in such case any attorney of any court of record of this state or elsewhere may appear for us and on our behalf, and confess judgment in an amicable action of assumpsit or trespass against us for the amount so due and owing, or for the value of said property, checks or payments retained, converted or appropriated, with waiver of exemption, release of errors, attorneys' commission of ten per cent. and without stay of execution. If the undersigned shall be a corporation, its officers or agents signing for it shall be jointly liable hereunder, and be made parties defendant in such action."

Giving this paragraph its fullest effect, I cannot see that it helps the bank in the present dispute. We must remember that the coats had from the first been the firm's own property, and that the original title revested when the goods were returned. The firm had already promised to pledge the coats to the bank, and in the foregoing paragraph the promise is now repeated, "We will receive the same in trust for the said Bank of Commerce under advice to them and surrender it, or the proceeds thereof if sold, upon demand;" but this is not the equivalent of an actual sale, or an actual pledge, as against a trustee in bankruptcy or creditors having a lien. To make such a sale or pledge effective, delivery or its equivalent is essential, and there is no pretense that delivery was made or even attempted. The trust receipt cases—of which Century Throwing Co. v. Muller, 197 Fed. 252, 116 C. C. A. 614, in this circuit is a recent example—differ in this vital fact: In those cases the debtor had never acquired title to the property in question; the title had always been in some one else; and his creditors were not allowed to deal with the property of this other person as if it were the debtor's, although the property had come into the debtor's actual custody. But here the debtor had always been the owner, and was also in actual possession; and the question is, How and when did the claimant validly acquire the debtor's title—either by sale or by pledge? This is a widely different inquiry, and the answer in the particular case is this: The claimant never did acquire such a title, for although the debtor promised to transfer it, he never did, and meanwhile the bankruptcy act makes effective the superior rights of the trustee. Guarantee Title Co. v. Bank (C. C. A. 3d Cir.) 185 Fed. 373, 107 C. C. A. 429; Bank v. Penn Motor Co., 235 Pa. 194, 83 Atl. 622.

The referee's order is affirmed.