### In re A. E. FOUNTAIN, Inc.

### In re CARL DERNBURG & SONS, Inc.

(Circuit Court of Appeals, Second Circuit. July 3, 1922.)

Nos. 182, 303.

1. **Chattel mortgages ⬅➡9, 194—Trust receipt, executed by debtor to creditor, held a chattel mortgage; trust receipt held invalid, because not filed.**

A trust receipt, executed by a debtor to a creditor to secure a loan, whereby the debtor agreed to hold described goods as the creditor's property, with liberty to sell them for the creditor's account and to turn over the proceeds to apply on the loan, was a chattel mortgage or conveyance intended to operate as such, and void as against creditors, under Lien Law N. Y. § 230, because not filed as required by the statute.

2. **Chattel mortgages ⬅➡9, 194—Trust receipt given by pledgor to pledgee held a chattel mortgage; trust receipt held void for lack of filing.**

Where a bank, to which a debtor had pledged a warehouse receipt for goods to secure an indebtedness, surrendered the warehouse receipt and took from the debtor a trust receipt, containing an agreement to hold the goods as the property of the bank, with liberty to sell the goods for the bank's account, and in such case to turn over the avails to apply on the indebtedness, the instrument was a chattel mortgage or a conveyance intended to operate as such, and void under Lien Law N. Y. § 230, for lack of filing.

⬅➡For other cases see same topic & KEY-NUMBER in 'all Key-Numbered Digests & Indexes

**3. Bankruptcy ⬤188(1)—Pledgee, surrendering possession to pledgor, not entitled to assert rights as against trustee.**

Where a bank to which a warehouse receipt had been pledged as security surrendered it and took a trust receipt, if the relation continued that of pledgor and pledgee, rather than mortgagor and mortgagee, the bank could not assert its title as against a trustee in bankruptcy, armed with rights given by the Bankruptcy Act as amended in 1910, where the receipt gave the debtor an unlimited power of sale, even on credit, and power to manufacture the goods and substitute others of equal value.

**4. Chattel mortgages ⬤194—Holder of trust receipt, deriving title from debtor, has no greater rights than holder of chattel mortgage.**

A holder of a trust receipt has no better standing as respects creditors than the holder of an unfiled chattel mortgage, on delivery of the property to the obligor to act as his fiduciary, unless he derives his security title from a person other than the one responsible for the satisfaction of the obligation which the property secures.

Appeal from the District Court of the United States for the Southern District of New York.

Petition to Revise and Appeal from the District Court of the United States for the Southern District of New York.

Two proceedings, by the President and Directors of the Manhattan Company against Robert P. Stephenson, trustee in bankruptcy of A. E. Fountain, Inc., and by the Irving National Bank against Julius E. Goldman, receiver in bankruptcy of Carl Dernburg & Sons, Inc., to reclaim property. In the first proceeding there was an order in favor of the petitioner, and the trustee appeals. In the second proceeding there was an order in favor of the receiver, and the petitioner appeals and brings a petition to revise. Order in the first proceeding reversed; order in the second proceeding affirmed, and petition to revise dismissed.

In the first case, the bankrupt, an importer, manufacturer, and dealer in dolls, borrowed $3,000 from the respondent on March 9, 1921, giving a demand note and as security therefor a document, purporting to be a trust receipt of certain merchandise then owned by and in possession of the bankrupt, which read as follows:

"Trust Receipt.

"In consideration of the sum of three thousand dollars ($3,000) to us this day loaned by the Bank of the Manhattan Company, 31 Union Square, New York, we have set aside as the property of the said bank the following goods and merchandise, as specified in the schedule hereto annexed. And in consideration of the said loan we hereby agree to hold said goods in trust for them and as their property, with liberty to sell the same for their account, but without authority to make any other disposition whatever of the said goods (or the proceeds thereof), either by way of conditional sale, pledge, or otherwise, and further agree, in case of sale, to hand the proceeds to them as soon as received to apply against the demand loan of $3,000 by said Bank of the Manhattan Company for our account, and for the payment of any other indebtedness or obligation of ourselves to them.

"We agree to keep said goods insured to their full value against fire, payable in case of loss to the said Bank of the Manhattan Company, with the understanding that they are not to be chargeable with the storage, premiums of insurance, or any other expenses incurred on said goods. We further agree that no failure or omission on our part to fully carry out any of the terms of this or any similar receipt or agreement, or of the agreement under which the said Bank of the Manhattan Company, makers of the loan of $3,000, shall be deemed a waiver by said bank of any of its rights or remedies,

under either or any of said papers, unless said waiver shall be in writing, indorsed thereon, and signed by the said bank.

"The Bank of the Manhattan Company may at any time cancel this trust, and take possession of said goods, and of the proceeds of such of the same as may then have been sold, wherever the said goods or proceeds may then be found. The intention of said agreement is to protect, and preserve unimpaired, the title of said Bank of the Manhattan Company to the said merchandise and the proceeds thereof.

"A. E. Fountain, Inc.,
"A. E. Fountain, Jr., Treas.

"Dated New York, March 9, 1921.

"Schedule.

| 10 Doz. | 198 | @ $ 33.00 | Doz | | $ 330.00 |
|---|---|---|---|---|---|
| 20 " | 200 | " 41.00 | " | | 820.00 |
| 20 " | 200 | " 41.00 | " | | 820.00 |
| 20 " | 280 | " 56.00 | " | | 1,120.00 |
| 10 " | 201 | " 64.00 | " | | 640.00 |
| 10 " | 201C | " 76.50 | " | | 765.00 |
| 20 " | 203 | " 73.00 | " | | 1,460.00 |
| 10 " | 302 | " 104.00 | " | | 1,040.00 |

$6,995.00

"The above merchandise, consisting of fully manufactured dolls, has been set aside in accordance with trust receipt, dated March 9, 1921, to secure demand loan of $3,000 of the same date.     A. E. Fountain, Inc.
"A. E. Fountain, Jr., Treas."

A. E. Fountain, Jr., the treasurer of the bankrupt, who executed the trust receipt on its behalf, has made affidavit that: "At or about the same time I saw to it that certain quantities of goods, of certain lot numbers, were upon the shelves of A. E. Fountain, Inc., and I thereupon listed such goods, which I had in mind as being the subject of the trust receipt, and thereupon signed in behalf of A. E. Fountain, Inc., the statement to the effect that the goods mentioned in the document had been set aside. These goods, which I saw to it were upon the shelves of A. E. Fountain, Inc., in the quantities mentioned in said document, stating that they had been set aside, were the goods which I referred to in said document as having been set aside. I understood that A. E. Fountain, Inc., had the right to sell all or any of said goods."

In the affidavit of A. E. Fountain, Sr., the president of the bankrupt, he has stated: "That at no time were any manufactured dolls or other merchandise set aside, or marked, or appropriated, or in any other shape, manner, or form designated as belonging to the Bank of the Manhattan Company, or as holding as collateral for the said bank in connection with the note of A. E. Fountain, Inc., to the bank for $3,000, dated March 9th, 1921, and the trust receipt of the same date. That on the contrary despite the note and trust receipt, the business of A. E. Fountain, Inc., was at all times before and after March 9, 1921, and until the bankruptcy herein, conducted in the ordinary manner. When dolls were manufactured they were placed in cardboard boxes on shelves in the stock room of A. E. Fountain, Inc., at No. 352 West Thirteenth street. In the regular course of business, sales were made and dolls were taken from the shelves in the stock room at random (except, of course, that dolls of the particular style, pattern, etc., called for were selected), to apply against the said orders. That before and after March 9, 1921, various and sundry sales of dolls were thus made, including sales of dolls of the pattern, style, etc., mentioned in the schedule annexed to the trust receipt of March 9, 1921. That the said sales were filled by taking dolls from the stock room shelves in the manner above set forth. That none of such sales were made for the account of the bank, nor were the proceeds received therefrom turned over to the bank or held for its account."

On July 20, 1921, an involuntary petition in bankruptcy was filed against A. E. Fountain, Inc. Robert P. Stephenson was appointed receiver, and there were found among the assets of the company 30 dolls less of style No.

198, 79 less of style No. 200, and 79 dolls less of style No. 201C, than the number of dolls of those styles set forth in the schedule annexed to the trust receipt. John S. Baker, a vice president of the bank, has stated in his affidavit that, shortly before the petition in bankruptcy was filed, A. E. Fountain, Jr., informed him "that he was at any time able to pick out the merchandise called for in said trust receipt." The debt due the bank remained unpaid, and the latter demanded of the receiver that he deliver possession to the bank of the merchandise on hand mentioned in the schedule. This demand was refused, whereupon a petition was filed in the District Court, praying for such delivery, and an order was made directing delivery, from which this appeal was taken.

It seems evident from the foregoing syllabus of the affidavits filed in the District Court that the merchandise sought to be covered by the trust receipt was ostensibly part of the stock in trade of A. E. Fountain, Inc., and was essentially treated as such.

In the second case, the Irving National Bank loaned $10,000 on June 4, 1921, to the copartnership of Carl Dernburg & Son taking their promissory note for that amount, with interest, and as security a negotiable warehouse receipt for certain fox skins, indorsed in blank by the partnership. Thereafter, and while the debt was still due, the corporation of Carl Dernburg & Sons, Inc., was organized and took over all the assets and liabilities of the partnership. On August 26, 1921, the bank issued to the corporation a delivery order for 1,337 of the fox skins embraced in the warehouse receipt, which the bank held to secure the loan that was still unpaid, and took back from the corporation a so-called trust receipt, the material clauses whereof were as follows:

"New York, 8/26/21.

"Received in trust from Irving National Bank, New York, the merchandise specified in the [bill of lading, or warehouse receipt] described on back hereof, dated June 4, 1920, issued by Fur Merchants' Cold Storage Company, Inc., 238/250 West Twenty-Eighth street, and in consideration thereof the undersigned hereby agrees to hold said merchandise in storage as the property of said bank until all terms hereof have been complied with, with the liberty to sell the same for its account, but without liberty to pledge, and in case of sale to hand, as trust funds so received, the avails as soon as received to the said bank to apply against its loan to the undersigned; and further agrees to hold said merchandise and/or the proceeds thereof in trust for the payment of said loan and of any other indebtedness of the undersigned to said bank. It is understood, however, that, if the proceeds of any sale or disposition of said merchandise shall be in notes or bills receivable, such notes or bills receivable shall be turned over to the bank upon receipt; but they shall not be applied hereunder until paid, but with liberty meanwhile to said bank to sell or discount, and so apply the net proceeds. If the merchandise is sold on open account, the undersigned agrees to mark accounts on its books as being 'assigned to Irving National Bank,' and further agrees to turn over the original checks to the bank when and as received to be applied on the loan. It is further understood that the undersigned may manufacture and remanufacture the above trust property, always taking such precautions as are necessary to properly identify the product, and may also sell the product of the same on the terms above mentioned. When in process of manufacture or remanufacture, so that the product can no longer be identified, the undersigned thereupon agree to keep and hold in trust for above bank and as their trust property manufactured goods of equal value with the property originally delivered to the undersigned, and undersigned will on demand deliver the same to the said bank. It is further understood and agreed that the undersigned may at any time, with the approval of said bank, substitute other goods of equal value in place of those originally covered by this agreement, and the rights of the said bank in regard to the goods so substituted shall be the same in every respect as if such substitution had not been made.

"The said bank or its representatives may at any time cancel this trust and take possession of said merchandise, or the unsold portion thereof, in

whatever condition it may then be, or of the whole or any portion of proceeds of the same, wherever the said merchandise or proceeds may then be found, and all the provisions of this trust receipt shall apply to and be deemed to include said above-mentioned merchandise, if the same shall have been made up or used in the manufacture of any other goods or merchandise; and the said bank shall have the same rights and remedies against the said merchandise in its manufactured state, or the product of such manufacture, as it would have had in the event that such merchandise had remained in its original state, and irrespective of the fact that other and different merchandise is used in completing such manufacture. In the event of any suspension, or failure, or assignment, or of the nonfulfillment of any obligation, or the nonpayment at maturity of any loan, or any other credit issued by the said bank on account of the undersigned, or of the nonpayment of any indebtedness on the part of the undersigned to said bank, all obligations, acceptances, indebtedness, and liabilities whatsoever shall thereupon, without notice, mature and become due and payable and said bank may then in its discretion exercise the lien conferred on it in the last paragraph hereof. * * *"

There were various payments made by the corporation to the bank in reduction of the above indebtedness, and on September 26, 1921, a collateral note for $4,000 and interest was given, secured by the 1,337 fox skins for which the trust receipt was outstanding. On October 19, 1921, the 1,337 fox skins were in the possession of Carl Dernburg & Sons, Inc., petitions in bankruptcy were filed against that corporation, and Julius E. Goldman was appointed receiver and took possession of the skins. The bank demanded delivery of the merchandise; the receiver refused to turn it over, whereupon an application for delivery was made to the District Court. The proceeding resulted in an order denying the application, upon the ground that the trust receipt was in effect an unfiled chattel mortgage. From that order the Irving National Bank has sought relief by appeal and petition to revise.

In No. 182:

Rosenberg, Ball & Marvin, of New York City (Wilbur L. Ball and George G. Ernst, both of New York City, of counsel), for appellant Stephenson,

John Delahunty, of New York City (John J. Kirby, of New York City, of counsel), for appellee President and Directors of Manhattan Co.

In No. 303:

Breed, Abbott & Morgan, of New York City (Henry H. Abbott and Edward A. Craighill, Jr., both of New York City, of counsel), for appellant Irving Nat. Bank.

Rosenthal & Heermance, of New York City (S. Michael Cohen, of New York City, of counsel), for appellee Goldman.

Before HOUGH and MAYER, Circuit Judges, and AUGUSTUS N. HAND, District Judge.

AUGUSTUS N. HAND, District Judge (after stating the facts as above). In the proceeding by the Bank of the Manhattan Company to reclaim the dolls which came into the possession of the receiver, there is no proof that the dolls referred to in the trust receipt were set apart. A. E. Fountain, Jr., says in his affidavit that he "saw to it that certain quantities of goods, of certain lot numbers, were upon the shelves of A. E. Fountain, Inc., and I thereupon listed such goods which I had in mind as being the subject of the trust receipt." A. E. Fountain, Sr., says that no merchandise was "set aside, marked or appropriated," that "when dolls were manufactured they were placed * * * on the

shelves in the stock room," and that "in the regular course of business sales were made and dolls were taken from the shelves at random." Moreover, no payments of any proceeds of such sales were made to the bank, and there were not enough dolls on hand of the styles specified in the trust receipt when the receiver took possession to satisfy its requirements. We can find no real contradiction of the statement of A. E. Fountain, Sr. Indeed, it seems conclusively borne out by the situation when the receiver came in.

There was no more than an arrangement whereby a certain number of dolls of the bankrupt's general stock should be held to secure the bank. It is exceedingly doubtful whether a chattel mortgage of such an unspecified portion of a borrower's chattels is valid. Kimberly v. Patchin, 19 N. Y. 330, 75 Am. Dec. 334; Newell v. Warner, 44 Barb. (N. Y.) 258; Croswell v. Allis, 25 Conn. 301; Cass v. Gunnison, 58 Mich. 108, 25 N. W. 52; Spivey v. Grant, 96 N. C. 214, 2 S. E. 45; Holman v. Whitaker, 119 N. C. 113, 25 S. E. 793; Tolbert v. Horton, 33 Minn. 104, 22 N. W. 126; Kellogg v. Anderson, 40 Minn. 207, 41 N. W. 1045. Indeed, it is not apparent that any of the dolls which A. E. Fountain, Jr., says were on the shelves when the trust receipt was given were there at the time the petition in bankruptcy was filed or ever came to the receiver. Justice Holmes said, when discussing a lien sought to be imposed under a day loan agreement upon securities purchased from a broker's general account in which the proceeds of the loan had been deposited:

"A trust cannot be established in an aliquot share of a man's whole property, as distinguished from a particular fund. * * * The result of the dealings between these parties * * * cannot be done away with by a wish or intention." National City Bank v. Hotchkiss, 231 U. S. at page 57, 34 Sup. Ct. at page 21, 58 L. Ed. 115.

[1] But, assuming that the merchandise which Fountain "had in mind" is still in existence, and was even so specified or appropriated that a lien was created upon it, would the bank fare better? The trust receipt contains an agreement to hold the goods in trust for the bank and "as their property." It starts out with the statement that the bankrupt has set aside the merchandise "as the property of the said bank," and concludes with the statement that:

"The intention * * * is to protect and preserve unimpaired the title of said bank * * * to the said merchandise and the proceeds thereof."

This arrangement seems more nearly to resemble a chattel mortgage than any other form of security. It is dependent on title rather than possession, and originates out of a loan of money rather than through a purchase and sale of goods, as does a conditional sale contract. If not a mortgage, it greatly resembles "a conveyance intended to operate as a mortgage of goods and chattels," and all such instruments are void as against creditors, unless followed by continued change of possession of the thing mortgaged or the filing required by the New York statute. Section 230 of New York Lien Law (Consol. Laws, c. 33).

But counsel for the bank contend that the trust receipt gave it an absolute title to the goods described therein, and one differing from that of a chattel mortgagee or of a person holding "a conveyance in-

tended to operate as a mortgage of goods and chattels." It is argued that the trust receipt cases are in a class by themselves, and that under such decisions as Charavay & Bodvin v. York Silk Mfg. Co. (C. C.) 170 Fed. 819, Century Throwing Co. v. Muller, 197 Fed. 252, 116 C. C. A. 614, In re Cattus, 183 Fed. 733, 106 C. C. A. 171, In re K. Marks, 222 Fed. 53, 137 C. C. A. 590, and particularly Commercial Bank v. Canal Bank, 239 U. S. 520, 36 Sup. Ct. 194, 60 L. Ed. 417, Ann. Cas. 1917E, 25, title under the trust receipt should prevail. On the other hand, counsel for the receiver insists that the trust receipt doctrine is of narrow limitation, and never covers a case like the present, where the borrower has secured his own debt and retains or obtains possession of the security. As the court said in the case of In re Shulman (D. C.) 206 Fed. 129:

"The Trust Receipt Cases * * * differ in this vital fact: In those cases the debtor had never acquired title to the property in question, the title had always been in some one else, and his creditors were not allowed to deal with the property of this other person as if it were the debtor's, although the property had come into the debtor's actual custody."

An excellent article by Karl T. Frederick, of the New York bar, entitled "The Trust Receipt as Security," beginning in the Columbia Law Review, vol. 22, No. 5 (May, 1922), discusses the origin, development and effect of "the trust receipt." It is said by the author that the case of Barry v. Boninger, 46 Md. 59, "is the earliest reported case in which the term 'trust receipt' is used." In the old case of Fletcher v. Morey, 2 Story, 555, Fed. Cas. No. 4,864, Mr. Justice Story, sitting as a Circuit Justice in the United States Circuit Court for the District of Massachusetts, had before him what may be regarded as in principle a trust receipt. There James Read & Co. applied to Fletcher, Alexander & Co. to grant Read & Co. a letter of credit under which Read & Co. were to draw drafts on Fletcher, Alexander & Co., and the latter were to receive bills of lading for shipments of merchandise from Liverpool, which bills of lading were under the arrangement pledged as collateral security for the payment of the drafts. The drafts were drawn by Read & Co. and accepted by Fletcher, Alexander & Co. The bills of lading did not run to the order of Fletcher, Alexander & Co., but to Read & Co., who sold part of the imported merchandise and had on hand the remainder of the merchandise and the proceeds of the portions sold in the form of bills of exchange. Under these circumstances Read & Co. went into bankruptcy. The suit was by Fletcher, Alexander & Co. to impress a lien upon the merchandise and proceeds. A decree was granted to Fletcher, Alexander & Co., and the only difference between this case and the usual trust receipt case as we find it to-day is that the complainant probably had an equitable rather than a legal title, because the bills of lading ran to the purchaser of the goods, instead of to the concern which financed the transaction. It is true that no formal trust receipt was made out whereby the goods, or bills of lading therefor after the receipt by the lender, were placed in the hands of the borrower, but an agreement was made that:

"The bills of lading are hereby pledged and hypothecated to [Fletcher, Alexander & Co.] as collateral security for the payment as above promised, and

held subject to their order or demand, with authority to take possession and dispose of the same at discretion for their security or reimbursement."

In the case of First National Bank of Cincinnati v. John Kelly, Sheriff, 57 N. Y. 34, it was held:

"* * * That the discount of a draft * * * passed to the party advancing the money upon the faith of the bill of lading, without fraud, not only the legal title to the property, but in the eye of the law the transfer of the bill of lading was regarded as actual delivery and an actual change of the possession," and that the case had "no analogy to those requiring the filing of papers given as a mortgage security, without the actual delivery at the time of the property mortgaged and a continued change of the actual possession."

The court said:

"If not the absolute owner, the plaintiff was a mortgagee in actual possession, when the cotton was wrongfully converted by the defendant, and it was not necessary, under any law, to file the papers as a chattel mortgage."

In the foregoing case the consignee obtained possession of the goods by attachment, so that there was not a voluntary surrender by the bank of the possession of the bill of lading. The effect of the decision, however, was to hold that upon the facts there was not such a chattel mortgage as to come within the terms of the filing act. In the case of Mechanics' & Traders' Bank v. Farmers' & Mechanics' National Bank, 60 N. Y. 40, the court refused to pass on what the nature of the bank's rights was, and contented itself with saying:

"The delivery of the bill of lading to the plaintiff was a good symbolical delivery of the grain, and the plaintiff thereby acquired a lien upon it or title to it, and was fully authorized to hold it until the loan was paid. * * * Whether the plaintiff held it as mortgagee, pledgee, or by any other title, is not material, so long as the title or the right to the possession was vested in the plaintiff."

The bank in this case gave the consignee the delivery order for the grain; the latter sold it, but the bank was held to have retained title. Much the same facts appear in Dows v. National Exchange Bank, 91 U. S. 618, 23 L. Ed. 214, a case arising in the Southern District of New York. Now the arrangements in all these New York cases, when analyzed, resemble the legal relations we find in a chattel mortgage. But, whatever theory was adopted by the courts in dealing with them, they universally held that filing was not necessary, either because title in the bank was absolute until the goods were paid for, or because there was symbolical delivery and constructive possession of the goods through ownership of the bills of lading. In essential respects the legal status of the person financing these operations resembles that of a mortgagee. The original vendor is the mortgagor, who has conveyed his title as security for the debt of the buyer. He also conveys his equity to the buyer of the merchandise. But the buyer has never held the legal title, and will not obtain it until and unless he pays his debt.

This generic correspondence with a chattel mortgage is pointed out by Mr. Frederick in the article we have referred to, but the practical difference to which he also alludes is that the ordinary chattel mortgage is a conveyance by a borrower to secure his own debt, whereas in the

foregoing cases the conveyance is by a third person to secure the debt of the buyer from him. The recording or filing acts are to prevent secret liens upon the property of persons who have had prior possession and ownership of the property. Yet, however close have been the legal relations of the parties in the cases cited to those of mortgagor and mortgagee, the courts have hesitated thus to define them, in part because of the practical difference from the ordinary case of a borrower, who conveys merchandise in his possession to secure his own obligation, and also probably quite as much from the fear that such a definition would bring the cases within the filing act. The commercial inconvenience of a legal requirement that banks financing imports should file the papers evidencing their arrangements and search the record offices to discover prior liens also doubtless has helped to deter the courts from holding that an arrangement constituted a chattel mortgage which no merchant would dream of regarding as one. As has been pertinently said:

"Much of this trade could hardly be carried on by any other means, and therefore it is of the first importance that the fundamental factor in the transaction, the banker's advance of money and credit, should receive the amplest protection. * * * This security is not an ordinary pledge by the importer to the banker, for the importer has never owned the goods, and, moreover, he is not able to deliver the possession." In re Dunlap Carpet Co. (D. C.) 206 Fed. 730.

The case of Barry v. Boninger, 46 Md. 59, is the first to which our attention has been called involving all the elements of the modern trust receipt. The earliest statement by the New York courts of the trust receipt doctrine was probably made in the case of National Bank v. Logan, 74 N. Y. 568. The bank there took both the bill of sale and the bill of lading in its own name, accompanied by a draft directing a delivery to the consignee on his acceptance of the draft. On the bill of lading was stamped a statement, addressed to the consignee, that the wheat was pledged to the plaintiff as security for payment of the draft, that the wheat was put into his custody in trust for that purpose, and that the merchandise was not to be diverted to any other use until the draft was paid. On acceptance of the draft, the bill of lading was delivered by the bank's correspondent to the consignee, who, after the merchandise arrived, but before maturity of the draft, sold it to the defendants. The court held that the purchase by the consignee did not pass title to him, and said:

"When commercial correspondents, on the order of a principal, make a purchase of property ultimately for him, but on their own credit, or with funds furnished or raised by them, and such course is contemplated when the order is given, they may retain the title in themselves, until they are reimbursed. One of the means by which this may be done is by taking the bill of sale in their own names, and, when the property is shipped, by taking from the carrier a bill of lading in such terms as to show that they retain the power of control and disposition of it. This results necessarily from the nature of the transaction. It is not, at once, an irrevocable appropriation of the property to the principal. It rests, for all of its efficiency and prospect of performance, upon the intention to withhold and the withholding the right to the property, so that that right may be used to procure the money with which to pay. It contemplates no title in the principal until he has reimbursed to

his correspondents the price paid by them, or to the person with whom they have dealt the money obtained from him with which to pay that price. From the start, the idea formed and nursed is that the property shall be the means of getting the money with which to pay for it, and that the title shall not pass to him who is to be the ultimate owner until he has repaid the money thus got."

Moors v. Kidder, 106 N. Y. 32, 12 N. E. 818, is perhaps the leading case in New York. There a shipment of shellac was delivered to the importer under an arrangement with Kidder, Peabody & Co., who represented Baring Bros. & Co., the bankers financing the transaction, for the purpose of enabling the importer to enter the goods at the custom house. The latter, however, pledged the goods to the plaintiff, with no authority to pledge or sell. The court held that the plaintiff acquired no title to the property. Judge Finch stated the law as follows:

" * * * Where a commercial correspondent, however set in motion by a principal for whom he acts, advances his own money or credit for the purchase of property and takes the bill of lading in his own name, looking to such property as the reliable and safe means of reimbursement up to the moment when the original principal shall pay the purchase price, he becomes the owner of the property instead of its pledgee, and his relation to the original mover in the transaction is that of an owner under a contract to sell and deliver when the purchase price is paid."

See, also, Drexel v. Pease, 133 N. Y. 129, 30 N. E. 732.

The Supreme Court of Massachusetts has adopted the trust receipt doctrine, and in the most recent case of Bank v. Mulholland, 228 Mass. 152, 117 N. E. 46, said:

" * * * The trust receipt which was employed by the plaintiff in its transaction with the firm is a well-known instrument of commerce, whereby the banker advancing the money on an importation takes title directly to himself, and as owner delivers the goods to the dealer in whose behalf he is acting secondarily, and to whom the title ultimately is to go when the primary right of the banker has been satisfied; the title remaining in the banker until the price is paid to him. * * *"

The Supreme Court of Connecticut, in the New Haven Wire Co. Cases, 57 Conn. 352, 18 Atl. 266, 5 L. R. A. 300, reached the same conclusion, as also have the courts of Pennsylvania and Wisconsin. Hamilton v. Billington, 163 Pa. 76, 29 Atl. 904; Mershon v. Moors, 76 Wis. 502, 45 N. W. 95. In the Pennsylvania case the trust receipt was held to create a valid bailment for the account of the bank.

The only case which is cited as extending the trust receipt doctrine is that of Commercial National Bank of New Orleans v. Canal-Louisiana Bank & Trust Co., 239 U. S. 520, 36 Sup. Ct. 194, 60 L. Ed. 417, Ann. Cas. 1917E, 25. Counsel for the bank strenuously insists that this decision is conclusive in favor of the latter's rights. It is to be observed at the outset that the trustee in bankruptcy was not a party to the appeal in the Supreme Court, though the case was one where there was a direct loan by a bank to the owner of cotton. The District Court had already held that the bank, though it had placed the goods within the control of the bankrupt and had taken a trust receipt therefor, could prevail against the trustee in bankruptcy, and also as well against another bank to whom the bankrupt had subsequently pledged the mer-

chandise. In re Dreuil & Co. (D. C.) 205 Fed. 568. The owner of the cotton had inland bills of lading therefor, and turned them over to the first bank, who surrendered them on obtaining the trust receipt; but these bills of lading were not apparently accompanied by drafts whereby title was retained by the consignor, but the property belonged without qualification to the bankrupt. In the Supreme Court the litigation was wholly between the two banks, while the trustee in bankruptcy had already been held in the District Court to have no rights in the merchandise. The Supreme Court held that the first bank, by clothing the bankrupt with indicia of apparent ownership, was barred by the Warehouse Receipts Act (Act La. No. 221 of 1908) from questioning the title of the second. In the course of the opinion the court said:

"We assume that under the jurisprudence of Louisiana the transaction between Dreuil & Co. and the Canal-Louisiana Bank (described by the bank as a pledge) created rights in the bank in the nature of ownership for the purpose of securing its advances, * * * and that when the Canal-Louisiana Bank intrusted the bills of lading to Dreuil & Co. for the purposes described in the trust receipts given to that bank, it could still assert its title as against Dreuil & Co. and their trustees in bankruptcy."

It would seem true that the above conclusion must follow if the assumption made by the court as to the Louisiana law was correct. Moreover, whether the assumption as to the general law of Louisiana on the subject was correct or not, the law of the parties before it was that the trustee in bankruptcy had no interest in the cotton in controversy, because such had already been the decision of a court of competent jurisdiction. At most the remarks were only dicta relating to the law of Louisiana, having no necessary bearing on the questions at issue. They were made in a case where no party was before the court interested in arguing that the trust receipt exception to the general rule requiring the filing of chattel mortgages or the retention of possession by the security holder was limited to cases where the title came to the money lender through one other than the borrower.

Every trust receipt decision cited by the Supreme Court in connection with the remarks we have quoted falls within the foregoing limitation. See Commercial Bank v. Canal Bank, 239 U. S. at page 524, 36 Sup. Ct. 194, 60 L. Ed. 417, Ann. Cas. 1917E, 25. Any such extension of the rights of the holders of trust receipts as is sought to be established here would, if consistently applied, enable every money lender, by employing a trust receipt, to preserve a secret lien, and would virtually destroy the efficacy of the Chattel Mortgage Act. We regard the contention as untenable and unsupported by authority. The only cases where the holders of trust receipts have been allowed by this court to prevail against the ultimate purchaser or his trustee in bankruptcy, have been those where the title of the holder of the trust receipt was derived from some one other than the debtor. In re Cattus, 183 Fed. 733, 106 C. C. A. 171; In re Coe, 183 Fed. 745, 106 C. C. A. 121; In re Marks & Co., 222 Fed. 52, 137 C. C. A. 590. The same is true of the decision of the Supreme Court in Dows v. National Exchange Bank, 91 U. S. 618, 23 L. Ed. 214, a case which arose in the Southern District of New York. The federal courts in the Third Circuit have adopted

the same view. Century Throwing Co. v. Muller, 197 Fed. 252, 116 C. C. A. 614; Assets Realization Co. v. Bank, 210 Fed. 156, 126 C. C. A. 662; Roth v. Smith, 215 Fed. 82, 131 C. C. A. 390; In re Dunlap Carpet Co. (D. C.) 206 Fed. 726; and In re Killian Mfg. Co. (D. C.) 209 Fed. 498. We have discovered no decision of any court extending the above doctrine, and this court has refused to extend it to a case like the present. In re Gerstman, 157 Fed. 549, 85 C. C. A. 211. See, also, American & British Sec. Co. v. Am. & British Mfg. Co. (D. C.) 275 Fed. 121.

Professor Williston, in an article entitled "The Progress of the Law," 34 Harvard Law Review, at page 759, has adverted to the possible misunderstanding of the scope of the trust receipt doctrine which might arise from the following remarks of the Massachusetts court in the case of Bank v. Mulholland, supra:

"The plaintiff purchased the hides in its own name and interest, for the ultimate use of the firm, directly from the foreign seller, and paid for them."

He says that it can make no difference whether the bills of lading originally ran to the order of the seller or the buyer. The remarks of Judge Finch in Moors v. Kidder, supra, which we have quoted, may be open to similar misconstruction. So long as the bills of lading of the seller are issued in such a way as not to allow title to pass to the purchaser until the goods are paid for, the individual or bank financing the operation can surrender the property to the buyer on trust receipt and still maintain title against the buyer or his trustee in bankruptcy. As Professor Williston said in the above article:

"In substance the transaction is a mortgage, and the only excuse for not requiring record can be that, on a balance of convenience, it is more important to have a form of business necessary for commerce proceed unhampered than it is to protect ownership of those to whom bankers have intrusted goods upon which they hold security. This excuse is no better and no worse when the bill of lading runs directly to the banker's order than when it is merely indorsed to him."

In view of the above considerations, we hold that in the case of Matter of Fountain, Inc., the reclaiming bank must fail, and the order directing delivery of the dolls by the receiver must be reversed.

[2] In the second case (Matter of Dernburg) the bank obtained a pledge of the fox skins by taking a warehouse receipt from the firm of Carl Dernburg & Son to secure the loan to it. The title was then in the copartnership, and the possessory control in the bank. The corporation of Carl Dernburg & Sons, Inc., which succeeded to the assets and assumed the liabilities of the partnership, thereupon became vested with the title to the skins, became to all intents and purposes a substitute for the firm, and upon obtaining a delivery order from the bank issued the trust receipt. By the delivery order of the bank, and the contemporaneous execution of the trust receipt, we have the pledgee surrendering its actual possession and the pledgor agreeing to hold the merchandise as the property of the bank. The words "as the property of said bank" most naturally mean as goods to which the bank has the legal title. But such an instrument might conceivably be regarded as a chattel mort-

gage, or might be considered a contract by the original pledgor to hold the merchandise still pledged as bailee for the bank. The parties were free, when the trust receipt was executed, to make any agreement which the law allowed, and their previous relations would not necessarily determine the legal effect to be given to the trust receipt. Under such circumstances we can see no reason why the trust receipt in the Dernburg case should be treated differently from the one we have already considered in Matter of A. E. Fountain, Inc. We consequently regard it as a chattel mortgage or a conveyance intended to operate as such, and therefore as void under section 230 of the Lien Law of New York for lack of filing. Any other analysis of the situation would render trust receipts, though identical in form and growing out of ordinary loans from A. to B. secured by B.'s property, dependent for their legal character upon consideration which can hardly be regarded as within the minds of the parties or consciously affecting their action.

[3] But, if the trust receipt in the Dernburg case was intended to preserve the original relation of pledgor and pledgee, the bank can fare no better, for such a delivery of the merchandise to the pledgor as was made under the terms of the trust receipt would destroy the pledge. We do not lose sight of the fact that there are decisions which have sanctioned a delivery of a pledge to the pledgor for a special and limited purpose, even when that purpose was a sale of the property. Kellogg v. Thompson, 142 Mass. 76, 6 N. E. 860; Thayer v. Dwight, 104 Mass. 254. But we venture to say that no such powers of dealing with the pledge as were given by the trust receipt in this case have ever been tolerated, where the rights of judgment creditors were involved, or the trustee in bankruptcy as here is armed with such rights by the amendment to the Bankruptcy Act of 1910 (36 Stat. 838). Here the tenure of the pledgor was unlimited in time, unless the bank chose to demand redelivery. He had an unlimited power of sale even on credit, and could manufacture the furs and substitute others of equal value. How far such a trust receipt is from one which conforms to the original trust receipt theory may be seen from comparing the instrument now under consideration with the one before this court in the case of In re K. Marks & Co., 222 Fed. 52, 137 C. C. A. 590.

If the present trust receipt can prevail against a trustee in bankruptcy, it is hard to say what protection exists against secret liens. We cannot doubt that pledged property given to a pledgor with such broad powers is utterly inconsistent with any practical view of a pledge. Moreover, the doctrine of "ostensible ownership" (discussed in another connection in Matter of Hub Carpet Co. [C. C. A.] 282 Fed. 12) would seem to mean nothing, if the rights of the pledgee could survive the redelivery of this merchandise after the giving of such a trust receipt. The arguments upon which the decisions in National Bank v. Logan, 74 N. Y. at page 583, and Moors v. Kidder, 106 N. Y. at page 40, 12 N. E. 818, proceeded, are entirely against the retention of a pledgee's interest in such a case. See, also, McFarland v. Wheeler, 26 Wend. (N. Y.) 467. As Justice Holmes said of another attempt to secure a lien through a so-called "day loan agreement":

" * * * If the intent was doubtful or inconsistent with the legal effect of dominant facts, it must fail." National City Bank v. Hotchkiss, 231 U. S. 50, 34 Sup. Ct. 20, 58 L. Ed. 115.

The legal effect of the dominant facts here is certainly entirely inconsistent with any reasonable theory of pledge. See, also, Salinas City Bank v. Graves, 79 Cal. 192, 21 Pac. 732.

[4] The result of the foregoing is that the holder of a trust receipt has no better standing than the holder of an unfiled chattel mortgage, unless he derives his security title from a person other than the one responsible for the satisfaction of the obligation which the property secures. In such a case only can he deliver the property to the obligor to act as his fiduciary.

In the Matter of A. E. Fountain, Inc., the order is reversed, with costs; and in Matter of Carl Dernburg & Sons, Inc., the order is affirmed, with costs, and the petition to revise is dismissed.