## In re CULLEN.

### Petition of COMMERCIAL CREDIT CO.

(District Court, D. Maryland. June 23, 1922.)

### No. 3576.

**Bankruptcy ⨐184(2)—Unrecorded trust certificates held invalid against creditors.**

Trust certificates, covering automobiles purchased by a dealer from the manufacturer on credit, who was in possession, executed to a credit company to secure advances made thereon to the manufacturer, and for which it was liable, not recorded as required of chattel mortgages and conditional sale contracts by the laws of the state, *held* invalid as against the creditors in bankruptcy of the purchaser.

In Bankruptcy. In the matter of Jay B. Cullen, bankrupt. On petition of the Commercial Credit Company. Petition dismissed.

Sylvan H. Lauchheimer and Malcolm H. Lauchheimer, both of Baltimore, Md., for Commercial Credit Co.

Baldwin & Sappington, of Baltimore, Md., for receiver.

ROSE, District Judge. The question in this case is how far a serviceable nag may be ridden, or, less metaphorically, may the so-called "trust receipt," highly useful in certain kinds of commercial transactions, and which the courts have in consequence struggled to sustain, in spite of its apparent conflict with recording laws, be upheld when the principal, if not the sole, reason for resorting to it, is to escape from those very statutes.

The Commercial Credit Company entered into an elaborate agreement with the Hupp Motor Car Corporation, which, though chartered in Virginia, has its principal place of business in Detroit. For brevity, they will be referred to as the "Commercial" and the "Hupp," respectively. The Commercial was to assist the Hupp and all wholesale distributors of the latter's product in the distribution of its wares, by providing credit through the purchase of acceptances, notes, drafts, conditional sale contracts, leases, agreements, chattel mortgages, or other forms of liens acceptable to the Commercial. To save much repetition, it was agreed that the one word "acceptance" should be taken to include all these various forms and kinds of instruments and undertakings.

The Commercial was to buy such of them as, being otherwise acceptable to it, did not represent more than 85 per cent. of the net wholesale price of the new motor vehicles, less freight and war tax. The Commercial was to pay in cash 90 per cent. of the face of the acceptance. It was to retain the remaining 10 per cent. until the sum represented by the acceptance was received by it, and until the Hupp and the latter's dealers and distributors had paid all they owed it. These acceptances were to be drawn by the Hupp, or its distributors or dealers, and all of them were to be accepted, indorsed, and guaranteed by the Hupp, or by its distributors, if any. They were to

---

⨐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

mature within three months of their respective dates. They were to be secured by trust receipts or chattel mortgages on motor vehicles on the floor or under the control of the distributor or dealer, or by other documents of title in form satisfactory to the Commercial. The latter assumed no responsibility in the event of a court decision adverse to the validity or effectiveness of any such trust receipts, chattel mortgages, or other document of title.

If the Commercial at any time deemed it necessary to take possession of any motor vehicle covered by any document of title or security held in connection with any acceptance, the Hupp was, within 30 days, or as soon thereafter as local law allowed, to purchase for cash such vehicle, wherever located, for not less than the unpaid principal of the acceptance, represented thereby, with interest and all costs and expenses. In the meanwhile, the Commercial was not to sell without the Hupp's consent, unless the law required it to do so. The right of the Commercial to insist that the Hupp should purchase was to be in addition to any indorsement, guaranty, or other agreement which the Hupp might have given it. If any of these acceptances were not paid within 10 days after their maturity, the Commercial had the right to require the Hupp to buy them within 30 days after demand for not less than the principal amount, with interest and costs. The Hupp, or its distributors or dealers, were to deposit with the Commercial such amounts as might from time to time be agreed upon, to be used as a reserve and guaranty against all compensation to be paid the Commercial, which was monthly to deduct such compensation therefrom, returning any excess.

The compensation was fixed at one twenty-fifth of 1 per cent. per day, or at the rate of 14.6 per cent. for a year, and, in addition, a flat charge of 1½ per cent. on the principal was made. As it was provided that the acceptances should not run longer than 3 months, this flat charge was at the rate of 6 per cent. per annum, or with the one twenty-fifth of 1 per cent. per day, a total of 20.6 per cent. per year. It is in evidence in this case that, when a 60-day extension was asked for, the Commercial said its charge for giving it was 1⅜ per cent. flat, or at the rate of 8¼ per cent. for 12 months, plus what it called a temporary charge of 2½ per cent.; that is, 15 per cent. a year, or equivalent, in the aggregate, to 23¼ per cent. Out of this the Commercial was, if I understand the agreement aright, to pay fire, theft, and transportation insurance, and from time to time to have checked, as against unpaid acceptances, motor vehicles under control of distributors and dealers. In addition it was to draw the papers it wanted the other party or parties to execute, and it was to try to get in the money due it, bearing the usual exchange and collection charges incident to remittances, but not, it was careful to add, any attorney's fees and costs or other unusual charges, which were to fall upon the Hupp.

The Hupp's Baltimore distributor was a concern known as the Stuart Automobile Company, hereinafter referred to as the "Stuart." One Cullen, of Pocomoke City, in this state, was a dealer in Hupp cars. In August, 1921, apparently through the Stuart, he purchased six cars from the Hupp. They were shipped from Detroit to Poco-

moke City, to the order of the Hupp, with directions to notify Cullen. The bills of lading were sent to a bank in Pocomoke, accompanied by these acceptances, one for each car, and each for $1,202.42, precisely 85 per cent. of the net wholesale price, less freight and war tax. These were drawn upon Cullen by the Hupp, and were payable to the Commercial 60 days after acceptance. They were indorsed by the Stuart. Attached to each of them was what is called a "trust receipt," by which Cullen acknowledged the receipt from the bank for the Commercial of the bill of lading, and acknowledged that the motor vehicle covered by it was the property of the Commercial. He agreed to take and hold it in trust for the purpose of storing it, undertaking not to operate it, for demonstration or otherwise, and, upon demand of the Commercial, to return it unused and in good condition to the order of the latter. He agreed not to sell, loan, rent, deliver, pledge, or otherwise incumber or dispose of it to any person, except upon written order from the Commercial, or upon release from trust by the bank or Commercial, upon cancellation and surrender of the trust receipt. This so-called trust receipt was also indorsed by the Stuart.

Three of the cars reached Pocomoke somewhat earlier than the others, but all the acceptances had matured at least as early as October 25, 1921. There was some error on the part of the bank about the delivery of three of the cars, as the trust receipts for them were not signed until September 29, more than 30 days after the cars had come into the possession of Cullen. Apparently, however, it was an unintentional oversight on everybody's part. For the purposes of this case I shall assume, without deciding, that the legal effect of these trust receipts is the same as if they had been signed before the bills of lading were handed to Cullen. When the earliest of the acceptances were about to mature, Cullen asked an extension from the Commercial of 60 days, to which the Commercial agreed, provided he made a 10 per cent. payment on account of principal and the extra charges already mentioned. He did not make these payments, but instead, towards the close of October, arranged, or thought he had arranged, to sell his business to some one else. There were delays in putting this transaction through. Towards the end of November the sheriff took possession of his place of business, and on the 2d of December a petition in bankruptcy was filed, upon which he was adjudicated. The motor cars came into the possession of his trustee in bankruptcy, and by agreement of all the parties they were sold as a part of the bankrupt estate, and it was stipulated that the trustee is to be treated as having received $5,086 for them.

At the hearing, the learned counsel for the Commercial frankly admitted that the trust receipt was taken, instead of a chattel mortgage, or a recorded conditional sales contract, because the bankrupt, in common with other dealers, preferred to keep from the public the fact that the cars in his garage had not been paid for. As the decided cases show, and as is well brought out in two able articles in the Columbia Law Review for May and June, 1922, the courts have been not a little puzzled in determining whether the commercial instruments

called "trust receipts," and which have nothing to do with technical trusts, are chattel mortgages, contracts of conditional sale, or something different from either. They have been held to be conditional sale contracts in some jurisdictions, in which such agreements are not required to be recorded. Under reverse conditions, they have been classed as chattel mortgages, and sometimes, when it would have been impossible to uphold them, had they been either one or the other, they have been said to be a peculiar kind of security, unlike either.

It is upon these authorities that the Commercial here relies. It is easier to feel that their facts distinguish them from the ordinary conditional sale contract or chattel mortgage, than to formulate the legal principles upon which the distinction rests, if it in fact exists. In most, if not all, the best-considered cases, in which trust receipts have been sustained, they have been employed in the exportation or importation of merchandise under conditions under which it would have been more or less inconvenient to have given either contracts of conditional sale, or chattel mortgages, and in connection with which it is not very likely that there would arise the evils against which the recording statutes are intended to guard. Some of the cases which have gone most thoroughly into the subject have commented upon the close margin upon which the bankers did business. Thus, in Century Throwing Co. v. Muller, 197 Fed. 252, 116 C. C. A. 614, Judge Gray thought it worth while to mention that the only compensation to bankers in that case was a small commission of 1¼ per cent. amounting to less than $200 for a transaction extending over six months and involving a liability of about $16,000. But it is scarcely possible to believe that what may be lawfully done in foreign commerce becomes illegal when applied to domestic transactions, or that the instrument constituting the security for a debt must be recorded, if the rate of interest or commission exacted by the lender is high, and need not if it is low.

The trust receipt, under the circumstances existing in most of the cases in which its validity has been upheld, is a highly useful and efficient instrument of commerce. Some of the courts are persuaded that the Legislatures, when they enacted recording statutes, were not seeking to limit its practical usefulness; but none of them have ever had the right or the wish to go counter to the settled public policy which those statutes evidence. They sometimes have made it clear that they did not intend to do so. In re E. Reboulin Fils & Co. (D. C.) 165 Fed. 245. In the instant case, the facts make it unnecessary to attempt to say what are the characteristics which distinguish a trust receipt from a chattel mortgage, or, if you will, a contract of conditional sale, or even to assert that there are any. To reach a decision in the matter now in hand, it is enough to hold, with the learned author of the articles in the Columbia Law Review, already mentioned, friendly as he is to those receipts, that—

"The only situation in which trust receipts can be properly used is one in which the title of property by way of security is conveyed to the creditor by the owner, who is not the person responsible for the satisfaction of the obligation which the property secures."

That is not the case here. Disregarding the wording of the papers, what actually happened was that the Hupp sold the motor cars to Cullen, retaining a lien upon them for the balance of the purchase price, and assigned such lien to the Commercial as collateral security for the advance made by the latter to it. Such a transaction differs in essential elements from one in which the so-called trust receipt may properly be used. There may be other reasons why, in the teeth of recording statutes, the Commercial was not entitled to assert title as against the trustee in bankruptcy. I rather suspect there are, but the one mentioned suffices.

The petition must be dismissed.