# McLEOD-NASH MOTORS, INC. v. COMMERCIAL CREDIT TRUST.[1]

December 16, 1932.

No. 28,811.

*Stinchfield, Mackall, Crounse, McNally & Moore, Perry R. Moore,* and *Heitmann, McCabe, Gruber & Clure,* for appellant.

*Fryberger, Fulton & Boyle* and *Arthur W. Hunter,* for respondent.

HOLT, J.

The appeal is from the order denying defendant's motion in the alternative for judgment notwithstanding the verdict or a new trial.

[1]Reported in 246 N. W. 17.

Both parties are corporations. Plaintiff was a retail dealer of Nash automobiles at Duluth. Defendant was in the business of financing automobile dealers. Plaintiff sues defendant for the conversion of six automobiles which were in plaintiff's place of business on December 1, 1930, and which with plaintiff's consent defendant moved to another garage in the city, but which were the next day, without plaintiff's knowledge or consent, sold and removed to Superior, Wisconsin. This is substantially established by the evidence:

Plaintiff would order certain cars from the Northwest Nash Motors, Inc. at Minneapolis, the distributor of that make of cars in the territory. The Northwest Nash Motors delivered the cars ordered to a railroad at Minneapolis for shipment to Duluth, drew a draft on plaintiff payable to the order of the First National Bank of Minneapolis through its correspondent, the Morgan Park State Bank of Duluth, and attached the bill of lading with directions to notify plaintiff. When so notified, plaintiff went to the bank holding the draft in Duluth, gave its check for the amount, received the draft and bill of lading, and obtained the cars upon surrendering the bill of lading to the carrier. The invoices for the cars appear to have been sent direct to plaintiff by the Northwest Nash Motors. When plaintiff gave its check to the bank for the draft, there were not as a rule enough funds to cover it. The arrangements with defendant were that it would advance 90 per cent of the invoice of a car upon plaintiff's delivering a trust receipt therefor and accepting a time draft payable to the order of defendant in three months from date. The draft included seven per cent interest and one per cent commission, and after maturity bore the highest rate of interest allowed by law. The advance made by defendant was in the form of a check delivered to plaintiff, payable to the order of Morgan Park State Bank, and was deposited in that bank by plaintiff. Such a deposit would cover any overdraft in plaintiff's deposit account created by its checks given in payment of drafts for cars ordered of Northwest Nash Motors. The important part of the trust receipt states:

454

"Received from Park State Bank of Duluth, acting for" defendant, the following motor vehicles (describing them):

"In consideration thereof undersigned agrees to hold said cars in trust for Commercial Credit as its property and to return all or any of said cars to Commercial Credit upon demand. * * * Commercial Credit may at any time cancel this trust and may take possession of said cars without notice or demand, and for such purpose it or its representatives may enter any premises at any time without legal process. Undersigned shall not lend, rent, mortgage, pledge, encumber, operate, use or demonstrate said cars, * * *. Undersigned, before the termination of this trust, may sell said cars for cash for not less than the sum or sums mentioned in the 'Wholesale-Storage' record of such cars, given by Commercial Credit to undersigned, and immediately after such sale undersigned shall deliver the proceeds thereof to Commercial Credit, and until delivery shall hold said proceeds in trust for Commercial Credit separate from the funds of undersigned.

"The acceptance of a time draft by undersigned or the negotiation of same and the assignment of this trust receipt shall not affect or terminate this trust, the intention being to preserve unimpaired the title and rights of Commercial Credit in and to said cars. If undersigned fails to sell said cars or to pay said time draft or breaches this trust receipt, then Commercial Credit may retain any sums paid by undersigned as a consideration for the privilege of displaying said cars and offering the same for sale."

This was signed and acknowledged by plaintiff. Three transactions are involved. The trust receipts and accepted time drafts are in the same terms. The transactions differ slightly as to matters immaterial to the questions presented.

The trial court held the transactions between plaintiff and defendant evidenced by the trust receipts and time drafts were loans secured by the cars named in the receipts, and hence, in legal effect, chattel mortgages. This is assigned as the main error. The cashier of the Morgan Park State Bank of Duluth, also named for short the Park State Bank, the correspondent of the First National Bank

of Minneapolis, to whose order the drafts drawn upon plaintiff by the owner and seller of the cars were payable, testified that plaintiff had a line of credit at the Duluth bank; that the witness attended personally to the three drafts covering the three shipments of cars in which were the six cars in question; that he accepted the checks of plaintiff drawn on his bank in payment· of the drafts and surrendered the bills of lading to plaintiff. He did this notwithstanding there was not enough in the deposit account of plaintiff to cover the check. There is no contradiction of this testimony. The manner in which the dealings between Northwest Nash Motors and plaintiff were actually transacted confirms this. Defendant had nothing at all to do with the sale of the cars to plaintiff, nor did it have any arrangement with either the seller of the cars or the Morgan Park State Bank of Duluth or the First National Bank of Minneapolis in respect to the payment of the drafts for the purchase of the cars or the bills of lading covering them. When the drafts for the purchase price were paid by the checks of plaintiff, the bills of lading attached to the drafts turned over to it, and the cars received from the carrier by plaintiff, the title was vested in plaintiff. There was then no outstanding right, title, or interest in defendant or any other party to the cars. So defendant's sole claim to title must arise out of the transaction with plaintiff wherein defendant gave its checks and in return received the accepted time drafts and trust receipts from plaintiff. This in law cannot be considered otherwise than a loan to plaintiff secured by its cars. In chattel mortgages the borrower transfers the legal title to the security to the lender. So here we may say that plaintiff, by the trust receipts, transferred the title to the cars as security to defendant.

But the statute, G. S. 1923 (2 Mason, 1927) §§ 8345-8359, contemplates that a chattel mortgage must be foreclosed in order to eliminate the mortgagor's right of redemption. The mortgagee may not arbitrarily take and dispose of the property mortgaged, as was done here in violation of the agreement under which plaintiff surrendered possession to defendant. Whether or not defendant's

manager had authority to make that agreement does not matter, for defendant undertook to dispose of the security without a foreclosure, which must be construed as a conversion of plaintiff's equity of redemption in the property. It is true that this action is between the parties to the instruments; and rights under the recording acts, or of third parties, are not involved. But the legal status of the parties must be ascertained from the transactions had and the writings evidencing the same, and their rights determined accordingly. Plaintiff borrowed money of defendant, securing the same by personal property. The transaction must be classified as a chattel mortgage. The cars under the transactions here cannot be considered in bailment, because title and possession was in plaintiff when the deals between the parties took place, and therefore plaintiff could not bail the cars to itself and retain possession. Not so in General Motors Acceptance Corp. v. Hupfer, 113 Neb. 228, 202 N. W. 627, and Holcomb & Hoke Mfg. Co. v. N. P. Dodge Co. 123 Neb. 142, 242 N. W. 367. In the first case the plaintiff purchased the automobiles from the manufacturer. Prior to unloading and prior to delivering the bill of lading to Trotter, a local dealer, Trotter executed a trust receipt to the plaintiff for the cars. Prior to the arrival of the cars Trotter gave a chattel mortgage upon them to the defendant. It will be noticed that title was there in the plaintiff and never in Trotter, and the court held the trust receipt a bailment and Trotter a mere bailee. The same situation was present in the second case. General Motors Acceptance Corp. v. Dunn Motors Inc. 172 Ga. 400, 157 S. E. 627, and id. 43 Ga. App. 275, 158 S. E. 626, upon which appellant also relies, shows that the plaintiff there derived title from the manufacturer and not from the dealer, who gave the trust receipt to the plaintiff. In Forgan v. Bridges (Mo. App.) 281 S. W. 134, the party who took the trust receipt held title when the dealer gave it and obtained possession. The same situation was present in Commercial Credit Co. v. Schlegel-Storseth Motor Co. (Tex. Com. App.) 23 S. W. (2d) 702.

It appears that trust receipts have been in use for a long time to finance imports. In such cases the banker who paid the draft

obtained the bill of lading and title to the goods and delivered possession to the dealer upon his signing the trust receipt, and he, from sales, was to pay the banker the amount of the draft the latter paid. This as between the parties is considered a true trust receipt, the dealer, the one giving the trust receipt, having at no time obtained title; hence he has no title or interest to mortgage or transfer. The clearest and most satisfactory judicial statement of the history, application, and limitation of the trust receipt doctrine is by Judge Augustus N. Hand in In re A. E. Fountain, Inc. (C. C. A.) 282 F. 816. The conclusion, after reviewing cases, was [282 F. 826]:

"The only cases where the holders of trust receipts have been allowed by this court to prevail against the ultimate purchaser or his trustee in bankruptcy, have been those where the title of the holder of the trust receipt was derived from some one other than the debtor."

The conclusion, upon facts stronger in favor of the holders of the trust receipts than in the instant case, was that the two transactions evidenced by the receipts were chattel mortgages. In Motor Bankers Corp. v. C. I. T. Corp. 258 Mich. 301, 241 N. W. 911, notwithstanding that the dealer gave a bill of sale and trust receipt and an accepted time draft to the defendant as part of the same transaction, the court held it a chattel mortgage. There is no good reason why the law pertaining to true trust receipts should be extended to loans secured by property the title and possession of which has been and remains in the borrower except for the rights given the holder of a trust receipt. Filing and recording acts are for the purpose of disclosing to third parties who intend to become interested in personal property that those in possession thereof as ostensible owners are not such in fact. In respect to this attempted extension of the trust receipt doctrine, the court in In re Cullen (D. C.) 282 F. 902, said:

"The question * * * is how far a serviceable nag may be ridden, or, less metaphorically, may the so-called 'trust receipt,'

highly useful in certain kinds of commercial transactions, and which the courts have in consequence struggled to sustain, in spite of its apparent conflict with recording laws, be upheld when the principal, if not the sole, reason for resorting to it, is to escape from those very statutes."

And the court approved this test stated by the author of an article on *Trust Receipts* in 22 Columbia L. Rev. pp. 395, 546 [282 F. 905]:

"The only situation in which trust receipts can be properly used is one in which the title of property by way of security is conveyed to the creditor by the owner, who is not the person responsible for the satisfaction of the obligation which the property secures."

Here the party who gave the trust receipt was responsible for the accepted time draft. We may also cite Commercial Inv. Tr. Corp. v. Wilson (C. C. A.) 58 F. (2d) 910; Hamilton Nat. Bank v. McCallum (C. C. A.) 58 F. (2d) 912; and Central Acceptance Corp. v. Lynch (C. C. A.) 58 F. (2d) 915. In the McCallum case a majority of the court concluded, because of the dual capacity in which a person acted as agent of the holder of the trust receipt and as officer of the party who gave the trust receipt, that title never got into the latter, and said [58 F. (2d) 913]:

"Trust receipts have generally been held not subject to recording or filing acts, probably because such statutes are to prevent secret liens upon property of persons who have had prior possession and ownership of the property. And it is undoubtedly for this very reason that holders of trust receipts have been allowed to prevail against the ultimate purchaser or his trustee in bankruptcy only where the title of the holder was derived from some one other than the debtor."

In the instant case it was derived from the debtor and from none other. See also In re Schuttig (D. C.) 1 F. (2d) 443, holding transactions like the ones before us chattel mortgages.

In addition to decisions hereinbefore referred to, defendant relies upon In re James, Inc. (C. C. A.) 30 F. (2d) 555, and In re Bell

Motor Co. (C. C. A.) 45 F. (2d) 19. In the James case the court recognized the rule in In re A. E. Fountain, Inc. 282 F. 816, saying [30 F. (2d) 557]:

"The holder of a trust receipt, if he derives his security from a person other than the one responsible for the satisfaction of the obligation which the property secures, is not obliged to file his security as is required in the case of a chattel mortgage. In such case only can he deliver the property to the obligor to act as his fiduciary."

The court there found that the holders of the trust receipts took title from the seller of the cars when they paid the sight draft attached to the bill of lading, and the consignee who executed the trust receipts never acquired title. The same was the situation in In re Bell Motor Co. (C. C. A.) 45 F. (2d) 19. But this statement of the court, made in speaking of divergent classification of trust receipts, is seized upon as applicable to the case at bar [45 F. (2d) 22]:

"They are, confessedly, valid instruments as between the Industrial Acceptance Corporation and the Bell Motor Company," the holder and the maker of the trust receipt.

So here, there is no reason why the receipts are not enforceable between the parties, and it must be conceded that defendant was within its rights in taking possession of the cars but became a wrongdoer when it sold and disposed of them without foreclosure.

It is urged that the recitals in the trust receipts estop plaintiff from showing that the title was in defendant. It can always be shown that a warranty deed or a bill of sale was given as security for a loan and that they are not what the writings purport on their face to be. And we have no doubt that here, where the evidence is conclusive that the title to the cars went from the Northwest Nash Motors to plaintiff, and that thereafter plaintiff accepted the time draft for the amount of money defendant furnished upon receipt of the trust receipts, the transaction was a loan which plaintiff secured by the trust receipts, plaintiff remaining in possession

of the property specified in the receipts. The recitals could not estop plaintiff from showing that the transaction was a loan secured by the trust receipt.

As stated before, the trust receipts are binding between the parties. There is no one here claiming under recording acts. In so far as taking possession, defendant was within its rights. But plaintiff had the right of redeeming the property, trusteed or mortgaged, by paying the debt. Defendant wrongfully destroyed that right by disposing of the property. And, as said above, we think our statutes indicate that a chattel mortgagor's rights in and to the property may be terminated only by a foreclosure. The sale of the property without foreclosure was therefore wrongful and a conversion thereof. None of the accepted time drafts were due. There was no attempt to cancel the trust receipts, and we are of opinion that such a drastic remedy could not be taken by a mortgagee, for that would do away with the foreclosure, the means intended by statute to terminate the mortgagor's interest in the property.

Complaint is made that the court erred in charging the jury that the measure of damages to be awarded was the market value at Duluth of the cars converted, less the amount due on the accepted time drafts. Defendant contends that this would give plaintiff the profit it would have made if it had sold the cars at retail. Defendant offered no testimony as to value, but claims the damages should be measured by the wholesale price plus freight. 2 Dunnell, Minn. Dig. (2 ed. & Supp.) § 1955, states:

"The general rule for the measure of damages, is the value of the property at the time of the conversion, with interest from that time. The market value is the standard of value." Among the cases cited to sustain the text may be mentioned Burger v. N. P. R. Co. 22 Minn. 343; Beebe v. Wilkinson, 30 Minn. 548, 16 N. W. 450; Dallemand v. Janney, 51 Minn. 514, 53 N. W. 803; Humphreys v. Minnesota Clay Co. 94 Minn. 469, 103 N. W. 338.

There is no good reason why in this instance the market value of the cars at Duluth should not be the measure of damages. It is

true, they could have been replaced at wholesale prices and incident expenses to putting them in plaintiff's possession; but these particular cars had been housed by plaintiff and exposed for sale in the ordinary way in which they are retailed; and in that connection expense had been incurred by way of rent, care, and salesmen. Much of the work and expense connected with a sale at retail had been incurred which went to establish the market value of such cars at the place they were when converted. There was no proof or offer of proof of any special circumstances which would warrant the court in giving any other measure of damages than the market value of the cars at Duluth.

The order is affirmed.

WILSON, C. J. and STONE and LORING, JJ. (concurring in result).

Whatever they are called, the so-called trust certificates are plainly security for a loan, the debt being evidenced by the outstanding accepted bill of exchange. For that reason we concur in the holding that under our law they should be regarded as chattel mortgages. We cannot agree that the mere fortuitous circumstance that title happens to come via the debtor rather than directly from the seller of the property, or from another intervening lender such as a bank, makes any difference. The determinative thing is that the title is held as security for the debt and is subject to defeasance upon payment of the debt.