CENTRAL CHRYSLER PLYMOUTH,
INC., formerly Central Motor Sales,
Inc., Respondent,

v.

Richard F. HOLT, Appellant,

Violet K. Holt, Respondent.

No. 47533.

Supreme Court of Minnesota.

April 21, 1978.

Wiese & Cox and Paul G. Neimann, Minneapolis, for appellant.

Mahoney, Dougherty & Mahoney, Kenneth P. Gleason, and Thomas E. Dougherty, Minneapolis, for Central Chrysler.

Maslon, Kaplan, Edelman, Borman, Brand & McNulty and Marcy S. Wallace, Minneapolis, for Violet Holt.

Heard before YETKA, SCOTT, and WAHL, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal by Richard F. Holt (appellant) from a judgment of the Hennepin County Municipal Court, which found that he had converted certain equipment. We affirm.

Central Chrysler Plymouth, Inc. (Central), an automobile dealership, brought an action against American Central Automotive, Inc. (American), a dealership which succeeded Central as lessee of a garage rented from the Holt family, for failure to pay for equipment American had allegedly agreed to buy from Central. In the same action, Central sought damages from its former landlords, appellant and Violet K. Holt, for converting the equipment. The trial court, sitting without a jury, dismissed the actions against American and against Violet K. Holt but found that appellant had converted the equipment. Damages were set at $4,000.

Central had rented the garage at 2007 Central Avenue in Minneapolis from successive members of the Holt family for approximately 24 years. In 1950, Central installed a two-post hoist, and in 1972, it installed four new single-post hoists in the garage. It paid approximately $4,000 for the new hoists and $3,700 more for installation.

In September 1972, Central decided that in March 1974 it would move its business to Roseville, Minnesota. Since Central's lease with the Holt family ran until December 31, 1975, Central explored the possibility of subleasing the garage to American. American's president, Harold A. Johnson, said that American would lease the garage for $1,500 a month, $200 more than Central had been paying. Appellant denied Central permission to sublease and made his own arrangements with Johnson. In the summer of 1973, William Hirsch, president of Central, discussed the sale of the hoists and other garage equipment with Johnson, tentatively agreeing to sell the hoists to American for $4,000.[1]

In August 1973, Hirsch and appellant met to discuss the lease, and Hirsch told appellant what equipment Central would leave behind. Hirsch sent appellant a letter on

---

1. Johnson says they did not agree as to price.

August 23, confirming the conversation and telling appellant that Johnson had agreed to pay Central $4,000 for the hoists. On October 25, appellant brought Hirsch an agreement to sign that guaranteed the Holt-American lease. Hirsch signed the agreement even though it did not include a copy of the Holt-American lease. Appellant told Hirsch that the lease was in accord with their August discussions.

On May 1, 1974, Central sent American a bill for the equipment. This bill was not paid. In June, Hirsch and Robert Gustafson, Central's treasurer, went to see Johnson. Johnson then showed them the Holt-American lease. This lease provided that "five hoists, grease rack and reels and lube equipment" were part of the property appellant was renting to American. Appellant's position is that the hoists are part of the building.

The following issues are presented:

(1) Were the hoists "trade fixtures"?

(2) If they were trade fixtures, did Central nevertheless abandon them by not removing them when it moved?

(3) If Holt is liable for conversion, did the trial court use the correct measure of damages?

1. The trial court held that the hoists were "trade fixtures" and that therefore Central had a right to remove them or to sell them to American. Appellant contends that the hoists were permanent "improvements" to the realty. Appellant's contention is based on consideration of three factors: the degree of physical annexation; the cost of removal; and the intent of the parties. Because this issue is a question of fact, the trial court's ruling must be affirmed unless clearly erroneous. Rule 52.-01, Rules of Civil Procedure.

a. *Degree of physical annexation.* In order to install the hoists, holes, 3 to 6 feet deep, were cut in the garage floor, sand was packed around the hoists, and the floor was then recemented. Thus, the hoists were quite firmly attached to the property.

We have, however, adopted a rule of "trade fixtures" which favors continued ownership of commercial equipment by a tenant. As this court said of gas pumps on concrete bases in *Moffat v. White*, 203 Minn. 47, 53, 279 N.W. 732, 735 (1938), "[t]he mere fact that such fixtures may be firmly attached does not in and of itself deprive the improvement from being classified as a trade fixture and as such removable." The United States Supreme Court in *Wiggins Ferry Co. v. O. & M. Railway*, 142 U.S. 396, 416, 12 S.Ct. 188, 194, 35 L.Ed. 1055, 1063 (1892), stated: "* * * [I]t is difficult to conceive that any fixture, however solid, permanent, and closely attached to the realty, placed there for the mere purposes of trade, may not be removed at the end of the term." In that case, the United States Supreme Court allowed railroad tracks to be taken up and removed as "trade fixtures." See, also, *Cohen v. Whitcomb*, 142 Minn. 20, 170 N.W. 851 (1919). But cf. *Northwestern Lumber & W. Co. v. Parker*, 125 Minn. 107, 145 N.W. 964 (1914).

b. *Cost of removal.* Appellant argues that because it costs almost as much to install the hoists as to purchase them, removal would not be economically feasible. The only authority referred to is *Davidson v. Ginsberg*, 190 Iowa 1327, 181 N.W. 661 (1921), in which tenants were barred, partially on the basis of economic feasibility, from taking the electrical wiring out of a building. The Iowa Supreme Court found, however, that the wiring would be reduced to "little more than junk value" by removal. 190 Iowa 1329, 181 N.W. 662. In the present case, the record indicates that Central could have used at least the four newer hoists in the new building it was constructing if it had removed them.

c. *Intent of the parties.* The intent of the parties is often a controlling factor in deciding whether a given item is a "trade fixture." *Moffat v. White*, 203 Minn. 47, 51, 279 N.W. 732, 734. Appellant argues that the following language from the 1964 lease-extension agreement is controlling on this point:

"* * * [A]ny and all * * * changes, alterations, improvements and additions to the property by Lessee which

are attached to the real estate, including signs, shall remain the property of Lessor upon the expiration or termination of this lease unless Lessor requests the removal thereof by Lessee * * * ."

The trial court, referring to "some confusion in [the various] documents in regard to the rights of the landlords and tenant," did not regard this language as determinative. Certainly Central's letter of August 23, 1973, indicated Hirsch's belief that Central had a right to sell the hoists; although the letter suggested that appellant call Hirsch if he had "any questions" about this disposition of the equipment, the record leaves room for substantial doubt as to whether appellant ever made any attempt to claim the hoists prior to including them in the lease with American.[2]

We considered a similar lease term in *Cohen v. Whitcomb, supra*, and held that a tenant who had installed a hot water heating plant, complete with pipes and radiators, could remove it from a building because it was not so inextricably a part of the realty as to be "an improvement." The Second Circuit Court of Appeals, considering a similar lease provision in *In re Howard Laundry Co.*, 203 F. 445, 447 (2 Cir. 1913), supported the proposition that to be "an improvement" an item should "savor of the realty," citing as examples new doors or windows.

It therefore seems appropriate to regard "improvement" as an ambiguous term and to construe it against the party who included it in the lease by holding that the term does not include "trade fixtures." Thus, the 1964 document cannot be viewed as clear evidence of a mutual intent to make the hoists part of the realty because the lease specified that only one type of trade fixture—"signs"—"shall remain" behind and did not specifically include "hoists" even though one hoist installed by Central had been in use for 14 years at the time of the 1964 lease-extension agreement. Thus, the trial court's ruling that the hoists were trade fixtures was not clearly erroneous and must be affirmed.

2. Ordinarily, a tenant must remove trade fixtures before the lease expires. *Erickson v. Jones*, 37 Minn. 459, 35 N.W. 267 (1887). An exception should be made, however, in cases where a tenant conditionally sells trade fixtures to a subsequent tenant who plans to carry on the same business. In such cases, where the landlord knows of the arrangement, the fixtures are not deemed abandoned. Cf. *Medicke v. Sauer*, 61 Minn. 15, 63 N.W. 110 (1895). Here, the record suggests that it was appellant's claim to own the hoists which thwarted Central's attempt to sell them to American. In short, appellant's arguments on this point are without merit.

3. Appellant contends that the cost of removing the hoists and repairing the garage floor should be deducted from the value of the hoists in calculating damages. Since damages for conversion are measured by the value of property converted at the place where conversion occurs, *McLeod-Nash Motors, Inc. v. Commercial Credit Trust*, 187 Minn. 452, 246 N.W. 17 (1932), the in-place value of these hoists is the proper measure of damages.

Alternatively, appellant may be regarded as having waived the right to have this equipment removed. The president of American testified that he considered the inclusion of the hoists in the lease as part of the consideration for the $200 rental increase. Thus, appellant would be unjustly enriched if the cost of a hypothetical removal of the hoists was subtracted from their in-place value. The trial court's assessment of the damages was proper.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.

---

2. Hirsch stated that his "next contact" with appellant was in October 1973, when appellant affirmed the position that he had taken in their talk in August, namely, that Central could sell the hoists.

Appellant says that he told someone at Central that the hoists had become part of the realty, but he was unable to remember with whom he had spoken, the date, the time, or any other circumstances of the conversation.