Paul W. LARSON, et al., Respondents,

v.

LAKEVIEW LOFTS, LLC,
et al., Appellants.

No. A10–2031.

Court of Appeals of Minnesota.

Sept. 6, 2011.

Michael L. Puklich, Neaton & Puklich, PLLP, Chanhassen, MN, for respondents.

Eric J. Magnuson, Amie E. Penny, Briggs and Morgan, P.A., Minneapolis, MN, Craig M. Mertz, Craig M. Mertz Law Office, Chanhassen, MN, for appellants.

Considered and decided by SCHELLHAS, Presiding Judge; PETERSON, Judge; and MINGE, Judge.

## OPINION

MINGE, Judge.

Appellants, an individual developer and his condominium-development company, challenge the district court's determination that they breached fiduciary/good-faith obligations imposed on them by Minn.Stat. § 515B.3–120(a)(2) (2010),[1] arguing that they did not have such obligations incident to selling the last 17 condominium units of the development and that, if they did, their conduct did not constitute a breach of their fiduciary/good-faith obligations. They also argue that the district court clearly erred in calculating damages. We conclude that appellants had fiduciary/good-faith obligations under Minn.Stat. § 515B.3–120(a)(2) in arranging for the sale of the units and that the district court did not clearly err in determining that appellants breached those obligations in selling the last 17 condominium units, but we reverse the damages awards because the improper timeframe was used for determining damages and because the damages proved by the party who still owns his unit are speculative. We remand for determination of damages for the owner who sold his unit and for entry of nominal damages for the other owner.

## FACTS

Appellant Todd Frostad organized and is the sole owner of appellant Lakeview Lofts LLC (Lakeview LLC).[2] In 2004, appellants initiated the Lakeview Lofts condominium project as a common-interest community (CIC) pursuant to the Minnesota Common Interest Ownership Act, Minn.Stat. §§ 515B.1–101 to .4–118 (2010).

---

1. The parties did not litigate in district court nor raise on appeal the definition of the statutory terms "fiduciary" and "good faith," how the obligations may differ or overlap, or to whom the obligations are owed. We do not address such matters in this appeal, and, in this opinion, we refer to them in tandem as "fiduciary/good-faith obligations."

2. This opinion does not distinguish between Frostad and Lakeview LLC as responsible parties except to clarify who is the moving entity at various points. Collectively, they are referred to as "appellants." The district court held Frostad personally liable for the breach of his fiduciary obligation and Lakeview LLC vicariously liable for Frostad's breach. Appellants do not challenge and therefore we do not consider questions of entity liability.

Frostad was the president of Lakeview LLC during the periods relevant to this litigation. This CIC is composed of 39 residential units and one commercial unit. As a part of organizing the CIC and to comply with the law and obtain local government approval, Lakeview LLC adopted a declaration, which all purchasers of the CIC units were required to accept. That declaration required, among other things, that the residential condominium units in the project be 75% owner occupied. Also as a part of the development and declaration, Lakeview LLC formed the Lakeview Lofts Homeowners' Association (Homeowners' Ass'n). Appellants controlled the Homeowners' Ass'n, with Frostad serving as the president and director until appellants surrendered control on July 7, 2006.

In October 2004, respondent Paul Larson agreed to purchase a condominium unit in Lakeview Lofts. He closed on the purchase in December 2005. Respondent Jesse Schneider bought a condominium unit in the building in January 2006. By late 2005 to early 2006, sales of condominium units began to slow. At that time, the interest rate on the loan appellants incurred to finance this development had increased, and Lakeview LLC was in financial trouble. By the end of May 2006, 17 residential units remained unsold.

In early 2006, Blackstone Sales LLC approached appellants and offered to assist with selling the remaining condominium units. In March or April 2006, appellants and Blackstone verbally agreed that Blackstone would market the remaining units at full list price and would receive a "management fee" of 10–11% of the sale prices of the units.

Between the end of June and early September 2006, Blackstone found purchasers for 14 units, with two individuals purchasing most of the units. Blackstone purchased three units itself. All sales were at the full list price. The management fee was not paid or disclosed incident to the first seven closings. Instead, the management fee for all 17 units was divided among and paid from the sales of the final 10 units. All told, Blackstone received $914,761.91 in management fees. Following the sales, appellants were able to pay off loans incurred to finance the Lakeview Lofts development and close out the project with a net profit of over $700,000.

Blackstone's buyers obtained nearly 100% financing for all 14 units they purchased. Although the declaration required that 75% of the units be owner occupied, only one of the 17 Blackstone-marketed units was owner occupied, defeating the owner-occupancy requirement. Neither Blackstone nor any of the Blackstone buyers made a single mortgage, property-tax, or condominium-association payment. All 17 Blackstone-marketed units (including the three it purchased) were foreclosed on by the mortgage lenders. The district court found that various problems with the Blackstone units significantly depressed the property value of the other Lakeview Lofts condominium units. In addition to the foreclosures, the problems included squatters occupying vacant units, vandalism, stolen property, and frequent "loud, boisterous incidents" in the building. Experts for both sides testified that, from mid–2006 to 2009, the drop in value of Lakeview Lofts condominium units exceeded the average market loss in value of condominiums in the seven-county metro area.

In March 2009, Larson and Schneider sued appellants for breach of contract and breach of fiduciary duty. After a bench trial in May 2010, the district court found that Frostad and Lakeview LLC had fiduciary/good-faith obligations to the condominium-unit owners pursuant to Minn. Stat. § 515B.3–120(a)(2) and breached

those obligations by entering into the agreement with Blackstone. Because the district court concluded that Frostad and Lakeview LLC had breached statutory fiduciary/good-faith obligations, it declined to reach the breach-of-contract claim. The district court awarded Larson $101,389.43 and Schneider $96,225.26 in damages and awarded attorney fees. Minn.Stat. § 515B.4–116(b). This appeal follows.

## ISSUES

I. Did appellants' fiduciary/good-faith obligations apply to their conduct in marketing the last 17 units?

II. Did appellants breach their fiduciary/good-faith obligations?

III. Did the district court use the proper timeframe when determining damages?

IV. Are Schneider's damages speculative?

## ANALYSIS

### I. Fiduciary Obligations and Obligations of Good Faith

The threshold question is whether appellants' statutory fiduciary/good-faith obligations under Minn.Stat. § 515B.3–120(a)(2) applied to the marketing of the last 17 residential units. Statutory construction is a legal issue that we review de novo. *Lee v. Fresenius Med. Care, Inc.,* 741 N.W.2d 117, 122 (Minn.2007). If a statute is unambiguous, we do not engage in further construction; instead, we apply its plain meaning. Minn.Stat. § 645.16 (2010). If there is some uncertainty, we construe statutes by attempting "to ascertain and effectuate the intention of the legislature." *Id.* To do so, we interpret statutes "in light of the surrounding sections to avoid conflicting interpretations." *Am. Family Ins. Grp. v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000). "We con-

strue statutes to effect their essential purpose but will not disregard a statute's clear language to pursue the spirit of the law." *Lee,* 741 N.W.2d at 123.

A CIC development, governed by the Minnesota Common Interest Ownership Act, Minn.Stat. §§ 515B.1–101 to .4–118, is created by recording a declaration and administered by a condominium-unit owners' association. Minn.Stat. §§ 515B.2–101(a), .3–101. When a CIC is created, the declaration can provide for a period of declarant control of the association. Minn. Stat. § 515B.3–103(c). The association may be organized as a for-profit or nonprofit corporation and is governed by a board of directors. Minn.Stat. §§ 515B.3–101, .3–103(a). Under Minn.Stat. § 515B.3–120(a):

> During any period of declarant control pursuant to section 515B.3–103(c), declarant and any of its representatives who are acting as officers or directors of the association shall ... (2) be subject to all fiduciary obligations and obligations of good faith applicable to any persons serving a corporation in that capacity.

A director of a corporation

> shall discharge the duties of the position of director in good faith, in a manner the director reasonably believes to be in the best interests of the corporation, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances....

Minn.Stat. § 302A.251, subd. 1 (2010); *see also* Minn.Stat. § 302A.361 (2010) (applying the same standard of conduct to an officer of a corporation); Minn.Stat. § 317A.251, subd. 1 (2010) (applying same standard to director of a nonprofit corporation). We also note that Minn.Stat. § 515B.3–103(a) provides: "In the performance of their duties, the officers and directors [of a condominium-unit owners'

association] are required to exercise (i) if appointed by the declarant, the care required of fiduciaries of the unit owners...." Finally, the CIC law provides that "remedies ... shall be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed." Minn. Stat. § 515B.1–114(a).

As previously stated, Lakeview LLC was the declarant for the Lakeview Lofts development, with Frostad serving as president and controlling the Homeowners' Ass'n until he resigned in writing on July 7, 2006. *See* Minn.Stat. § 515B.3–103(c) (providing that, except in circumstances not applicable here, the declarant does not surrender control of the association until written notice is provided to the unit owners). Appellants argue that, under the statute's plain language, the fiduciary/good-faith obligations only applied when Frostad was actually performing his duties as an officer or director of the Homeowners' Ass'n. Appellants assert that because Frostad was acting on behalf of himself and Lakeview LLC when he entered into the agreement with Blackstone, he was not acting on behalf of the Homeowners' Ass'n. Therefore, appellants conclude that under the plain meaning of the statute, they owed no fiduciary/good-faith obligations to the Homeowners' Ass'n or other unit owners incident to the marketing of the last 17 units in the Blackstone-related transactions.

Section 515B.3–120(a) makes a general statement that the declarant and its representatives who are acting as officers and directors of a homeowners' association have fiduciary/good-faith duties (obligations). No language in Minn.Stat. § 515B.3–120(a) limits the timeframe during which a declarant, officer, or director is subject to these obligations. The "who-are-acting-as" language which appellants

point to is part of the phrase identifying who has fiduciary/good-faith obligations; it does not limit the scope of the obligations.

We emphasize that section 515B.3–120 is the basis for our decision. The statutory language in section 515B.3–103(a) referring to "the care required of fiduciaries" is in addition to and does not limit the fiduciary/good-faith obligations established in section 515B.3–120, nor does the "in-the-performance-of-their-duties" language in section 515B.3–103(a) limit the reach of section 515B.3–120. Regardless, we note that no language in either section excludes the impact of business dealings by a declarant, officer, or director on the CIC when acting in a capacity other than as a declarant, officer, or director. Rather, that statutory language requires that the duties themselves be carefully considered. We decline appellants' invitation to overanalyze these statutory provisions to generate uncertainty and limit the timeframe during which section 515B.3–120 fiduciary/good-faith obligations must be observed.

We note that Minn.Stat. § 515B.3–120(a), applicable to the CIC setting, imposes the fiduciary/good-faith obligations similar to those of persons serving in a corporate capacity. Neither party provides us with caselaw or analysis fleshing out the duty of a corporate officer or director who simultaneously holds positions in two or more business organizations or who has potential conflicts with personal investments. There are well-established principles regarding the obligations of directors and officers in self-dealing: they owe a fiduciary duty to the corporation when acting in their personal capacity to avoid self-dealing, Minn.Stat. § 302A.255, subd. 1 (2010), or usurpation of corporate opportunities, *Miller v. Miller,* 301 Minn. 207, 224–27, 222 N.W.2d 71, 81–82 (1974). While such situations are not fully analogous to the case at bar, they illustrate that

fiduciary and good-faith obligations are not strictly limited to the execution of duties of an officer or director. The unqualified language of the statute and the range of times and settings in which corporate affairs may come to one's attention indicate that there is no realistic way to compartmentalize the fiduciary/good-faith obligations.

Turning to the appeal before us, the record establishes that, until July 7, 2006, Lakeview LLC owned almost half of the residential units in the project, and Frostad was the president and a director of the Homeowners' Ass'n. Together, they controlled the Homeowners' Ass'n, and Frostad was or should have been aware of the interests of the Homeowners' Ass'n and other unit owners in selling the remaining units. When investing in their units, the early purchasers were depending on the integrity of Frostad and Lakeview LLC to act reasonably, appropriately, and otherwise consistently with the project's organizing documents in selling the remaining units. The adherence of appellants to the declaration and their integrity in selling the remaining units was of critical importance to the Homeowners' Ass'n and to the initial purchasers.

▇▇▇ Considering the overall role of the declarant and its representatives who served as officers/directors of the Homeowners' Ass'n and the unqualified, statutorily imposed fiduciary/good-faith obligations, those obligations are not limited to the time when declarant and its representatives are directly focused on tasks being undertaken as an officer or director for a homeowners' association but rather are generalized obligations that the declarant and its representatives are responsible for honoring in all dealings affecting such association. If there is a conflict, it is the responsibility of the party with such obligations to candidly disclose the conflict and, whether by resignation, recusal, consent, or some other strategy, to address and resolve the conflict with the person or entity to which the obligation is owed. *Cf.* Minn.Stat. § 302A.255 (providing for ways for corporation directors to overcome a conflict of interest). Here, section 515B.3–120(a)(2) simply provides that there are fiduciary/good-faith obligations.

Frostad, as president of the Homeowners' Ass'n, could not take off his "hat" as the president of that association and dispense with the fiduciary/good-faith obligations associated with that position when arranging the sale of the other condominium units. In other words, that Frostad was wearing another "hat" when arranging the sale of the 17 remaining units did not mean that he ceased to wear the "hat" generating the fiduciary/good-faith obligation under Minn.Stat. § 515B.3–120(a)(2). Frostad, as president of the Homeowners' Ass'n, had such an obligation whenever it was reasonably apparent that his conduct could impact the declaration and basic affairs of Lakeview Lofts condominiums, regardless of which "hat" he was wearing. Relaxing those obligations would be a limitation on the statute, inviting and excusing pernicious conduct.

▇▇▇ We conclude that, until the July 7, 2006 written resignation, Lakeview LLC, as the declarant, and Frostad, as president of Homeowners' Ass'n, had, in selling the remaining condominium units, fiduciary/good-faith obligations not to violate the declaration and not to harm the interests of the Homeowners' Ass'n and other unit owners.

## II. Breach of the Fiduciary/Good-Faith Duty

The next question is whether appellants breached their fiduciary/good-faith obligations by failing to act "with the care an ordinarily prudent person in a like position

would exercise under similar circumstances." *See* Minn.Stat. § 302A.251, subd. 1. Statutory construction is a question of law that we review de novo. *Lee*, 741 N.W.2d at 122. We review a district court's factual findings for clear error and defer to its credibility determinations. Minn. R. Civ. P. 52.01; *Alam v. Chowdhury*, 764 N.W.2d 86, 89 (Minn.App.2009).

The district court found that appellants breached their fiduciary/good-faith obligations when they entered into the agreement with Blackstone. After hearing the witnesses and reviewing the documentary evidence, the district court found that the breach occurred because there were several "red flags" in the Blackstone arrangement and because Frostad knew or should have known that the arrangement "would result in sales that would likely be foreclosed, and that the foreclosures would be detrimental to the current condominium homeowners."[3] The district court found that an ordinarily prudent person in Frostad's position should have recognized "characteristics of a mortgage fraud scheme present in the agreement" because:

1) the management fee for all the sales was to be split among the last ten units, not all seventeen, and was never disclosed to the first seven purchasers and lenders, in violation of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601–17 (2006);

2) the agreement with Blackstone was never put into writing, despite involving a transaction worth over $900,000; and

3) Blackstone promised to provide purchasers who would pay the full list price for the units and hold them as investments, at a time when the condominium market was declining.

Respondents' expert also testified that the multiple units purchased by single individuals and the speed of the closings pointed to fraudulent transactions.[4]

Appellants do not challenge the district court's findings and conclusions that, based on the nature of their arrangement with Blackstone, they knew or should have known that the agreement had "characteristics of a mortgage fraud scheme." Rather, appellants assert two defenses. First, they argue that, if they had fiduciary/good-faith obligations in selling the remaining units, no breach of the obligations occurred prior to July 7, 2006 but rather occurred when the sales facilitated by Blackstone closed which was after Frostad had relinquished control of Homeowners' Ass'n. The district court found that Frostad entered into the Blackstone agreement to market all 17 units in March or April 2006 and that, at that time, Frostad was aware of the various warning signs identified by the district court and should have investigated further. The district court found that Frostad breached his obligations when he initially entered the Blackstone arrangement.

Second, Frostad argues next that any fiduciary/good-faith obligations he may have had were no greater than the obli-

---

3. Appellants attempt to use a cut-off date prior to July 7, 2006 on the basis that Frostad gave oral notice of surrendering control to the association members at a meeting in May 2006. However, because Minn.Stat. § 515B.3–103(c) and the declaration require that the resignation be in writing and because Frostad did not provide written notice until a

letter dated July 7, 2006, he owed fiduciary/good-faith obligations until that date.

4. We also note that there is evidence in the record that, prior to July 7, 2006, Frostad was notified of multiple sales to one purchaser, compromising the 75% owner-occupied requirement in the declaration.

gation of an officer of a corporation. Frostad claims that, because professionals valued and evaluated the sales of the 17 condominium units, the statutory provision for such reliance, Minn.Stat. § .302A.251, subd. 2(a)(2) (2010), relieves him of liability. Specifically, Frostad argues that he relied on independent appraisers to value the units and on mortgage companies to evaluate the Blackstone purchasers, that these were experts, that neither these experts nor the purchasers themselves ever questioned the values or management-fee arrangement, and that the lenders accepted the ability of the purchasers to pay their mortgages.

The district court rejected this argument as overlooking the fact that, because Blackstone's 10–11% management fee was not disclosed in the first seven sales, this cost was hidden from appraisers. The district court found that, by not disclosing the fees on these first Blackstone sales, comparable sales values were inflated and the appraisers were misled in determining the value of the units, facilitating nearly 100% financing of the sales of the 17 units. The district court found that, if the management fee had been disclosed, 100% financing "would likely not have been obtained by the Blackstone purchasers." We also note that the district court's findings are further supported by evidence in the record that Frostad was expecting Blackstone to find buyers for, or itself buy, the units at full list price in a down market after a prominent real-estate firm had been unable to find buyers for the units. These matters are all based on pre-July 7 information.

 Having found what it determined to be significant warning signs surround-

ing the deal with Blackstone, the district court further found that, prior to July 7, 2006, a reasonably prudent person in Frostad's position would have exercised more care before entering the agreement, that minimal evaluation of the Blackstone offer would have alerted Frostad to the dubious nature of the proposal, and that if he had acted with care, the adverse consequences that resulted from this Blackstone deal may have been averted.[5] We conclude that the district court did not clearly err in its factual findings and that, based on those findings, the district court did not err in determining that appellants breached their fiduciary/good-faith obligations.

### III. Damages

 The third set of issues relates to damages. Frostad argues that the award of damages to both Larson and Schneider was clearly erroneous because the period for calculating damages was misidentified and that the award of damages to Schneider was doubly erroneous because they were speculative. A reviewing court will not disturb a damage award "unless its failure to do so would be shocking or would result in plain injustice." *Hughes v. Sinclair Mktg., Inc.*, 389 N.W.2d 194, 199 (Minn.1986). Remote and speculative damages cannot be recovered, but there is no general test for identifying damages that are remote or speculative, and "such matters should usually be left to the judgment of the [district] court." *Jackson v. Reiling*, 311 Minn. 562, 563, 249 N.W.2d 896, 897 (1977); *see also Cardinal Consulting Co. v. Circo Resorts, Inc.*, 297 N.W.2d 260, 267 (Minn.1980) ("Uncertainty as to the *fact* of whether any damages were sustained at all is fatal to recovery." (quo-

---

5. The record includes as a trial exhibit a federal grand jury indictment of the principals of Blackstone for criminal fraud in arranging the purchase of approximately 70 properties. This indictment occurred after July 7, 2006, was not referenced by the district court, and is not relied upon by this court.

tation omitted)). "The determination of actual damages is a fact question reviewable under the clearly erroneous standard." *Teachout v. Wilson,* 376 N.W.2d 460, 464 (Minn.App.1985), *review denied* (Minn. Dec. 30, 1985).

## A. Timeframe

Appellants point out that the district court found the operative, wrongful breach occurred in April 2006 when they entered into the arrangement with Blackstone and that, assuming they have liability for violation of fiduciary/good-faith obligations, the district court erred in determining damages because it failed to use that date to determine respondents' losses.

As a general rule, damages are measured from the time of the breach. *See id.* In *Teachout,* we reversed an award of loss-of-bargain damages where the only evidence introduced to prove damages was the price at the time of the sale of the business, which was two and one-half years after the original contract was breached. *Id.* In concluding that this was not sufficient, we observed that there was no baseline from which damages could be calculated because "[t]here [was] no evidence of the fair market value of the business at or near the time of the breach." *Id.*

Assessing damages from the time of the breach is also the measurement used in other circumstances. *See, e.g., Cambern v. Hubbling,* 307 Minn. 168, 172, 238 N.W.2d 622, 625 (1976) (breach-of-warranty damages measured from the time and place of acceptance of the goods); *Molenaar v. United Cattle Co.,* 553 N.W.2d 424, 431 (Minn.App.1996) ("The measure of dam-

ages in conversion cases is generally the value of the property at the time of the conversion plus interest." (citing *McLeod–Nash Motors, Inc. v. Commercial Credit Trust,* 187 Minn. 452, 460, 246 N.W. 17, 20 (1932))); *Grimes v. Minneapolis, St. Paul, Rochester & Dubuque Elec. Traction Co.,* 133 Minn. 442, 444–47, 158 N.W. 719, 720–21 (1916) (measuring damages as the difference between the value of the farm if a train station had been erected nearby and its value without such station at the time of the breach).

In this case, the district court used the purchase price of Larson's and Schneider's condominiums and the date those prices were agreed on as the baseline. For Larson, the date was October 2004; for Schneider, it was January 2006. The district court then relied on testimony to determine the average market depreciation for condominiums in the seven-county metro area for what it deemed to be the relevant period. For Larson, the period began in October 2004 and ended when he sold his unit in October 2009. For Schneider, who still owned his unit, the period started in January 2006 and ended when the 2008 tax-assessed value was established. The district court calculated Larson's damages to be the difference between his sale price and what the condominium would have been worth if it had been subject to only the market's decline. It noted that the market change was 1%. The remaining loss of $101,389.43 was damages. For the shorter period used to measure Schneider's loss, the market change was a more dramatic 26% drop and the resulting damages were $96,225.26.[6]

---

**6.** Appellants assert that, because Larson closed on the purchase of his unit at the end of December 2005 and Schneider closed on his unit a few days later, the district court clearly erred in considering the amount of market decline between 2004 and 2005 in

calculating Larson's damages, or, conversely, that the 26% drop in value for Schneider's unit was clearly erroneous. However, appellants' argument overlooks the fact that Larson's purchase price was set in October 2004, when he signed a purchase agreement. This

■ We agree with appellants that these beginning dates are not the proper dates to use to measure damages. Instead, the district court should have started with values as of the time when the fiduciary/good-faith obligations were breached—namely, April 2006, when Frostad contracted with Blackstone—and, after adjusting for the general market decline from that time, determined loss caused by appellants.

Because we conclude that the district court used the wrong timeframe, we reverse the award of damages and remand the determination of Larson's damages based on the existing record and in accord with this opinion.

## B. Speculative Damages

■ There is a further issue with Schneider's damages; Schneider did not sell his unit. Not having a sale price, the district court attempted to determine the value of the unit as of the time of trial. The issue is whether Schneider's unrealized loss was speculative and unrecoverable.

Schneider testified that he was not attempting to sell his unit at the time of trial and that he purchased the property because he needed somewhere to live. Schneider's own expert also testified that the impact of foreclosures is "curable." Thus, it is entirely possible that, if Schneider continues to occupy his unit for several more years, the effects of the mortgage foreclosures in 2009–10 will be neutralized by the passage of time and no longer depress the value of his unit. To measure Schneider's damages as if he sold the unit at the time of trial results in an unrealized, theoretical, and speculative loss.

Because we conclude that the damages found by the district court were speculative with respect to Schneider and that, despite liability, there is no basis in the record for establishing his damages on an arguably proper basis, we reverse his damage award and remand for entry of nominal damages.

## DECISION

We affirm the district court's determination that Lakeview LLC, as the developer of the condominiums, and Frostad, its principal who served as the president and director of the Homeowners' Ass'n, had statutory fiduciary/good-faith obligations in marketing the last 17 units and that the district court did not clearly err in determining that the arrangement Lakeview LLC and Frostad had with Blackstone violated those obligations. Because the wrong timeframe is used to determine damages, we reverse the damage awards. We remand the issue of Larson's damages for determination of damages based on the record and in accord with this opinion. Because the damages suffered by Schneider were speculative, we reverse and remand for entry of nominal damages.[7]

**Affirmed in part, reversed in part, and remanded.**

explains the choice of date and difference between Larson's and Schneider's calculations.

**7.** Appellants do not address the award of attorney fees. We note the statutes provide for attorney fees. Minn.Stat. §§ 515B.3–111(b), .4–116(b). Because we have concluded that respondents have prevailed in establishing appellants' liability, we do not consider the subject, and that portion of the district court's decision stands.